**AVESTA SHEFFIELD, INC., Bristol Metals, Inc., Damascus Tube Division, Damascus–Bishop Tube Co., Trent Tube Division of Crucible Materials Corporation, and the United Steelworkers of America (AFL–CIO/CLC), Plaintiffs,**

v.

**The UNITED STATES, Defendant,**

and

**Sammi Metal Products Co., Ltd., and Pusan Steel Pipe Co., Ltd., Defendant–Intervenors.**

**No. 93–01–00062.**

United States Court of International Trade.

Nov. 18, 1993.

Collier, Shannon, Rill & Scott, David A. Hartquist, Jeffrey S. Beckington, Kathleen W. Cannon and Mary T. Staley, Washington, DC, for plaintiffs.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, Cynthia B. Schultz, Michelle K. Behaylo, Atty. Advisor, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, DC, of counsel, for defendant.

Morrison & Foerster, Donald B. Cameron, G. Brian Busey and Craig A. Lewis, Washington, DC, for defendant-intervenors.

## OPINION

RESTANI, Judge:

Plaintiffs Avesta Sheffield, et al. ("Avesta"), move for judgment on the agency record, arguing that the United States Department of Commerce, International Trade Administration ("ITA") erred in its assessment of antidumping duties. The primary issues presented by this case are 1) whether a pass-through or "tracing" analysis is a condition for the grant of a duty drawback adjustment, 2) whether ITA relied on erroneous cost data, 3) whether ITA erred in relying on duty-inclusive data to determine constructed foreign market value, and 4) whether ITA properly adjusted U.S. price and foreign market value for value-added taxes.

## BACKGROUND

On behalf of the domestic industry, Avesta filed a petition alleging dumping of welded stainless steel pipe from the Republic of Korea and Taiwan on November 18, 1991. *Certain Welded Stainless Steel Pipes from the Republic of Korea and Taiwan*, 56 Fed.Reg. 65,043, 65,043 (Dep't Comm.1991) (init. of antidumping duty investigations). On December 13, 1991, ITA initiated an antidumping duty investigation of foreign pipe manufacturers, including defendant-intervenors Sammi Metal Products Co., Ltd. and Pusan Steel Pipe Co., Ltd. (collectively "respondents"). *Id.* at 65,044. ITA initiated a cost of production investigation on April 3, 1992 in reaction to Avesta's allegations that respondents sold merchandise in the home market below cost. *Certain Welded Stainless Steel Pipes from the Republic of Korea*, 57 Fed. Reg. 27,731, 27,732 (Dep't Comm.1992) (prelim. determ. of sales at less than fair value ("LTFV") & postponement of final determ.) (*"Preliminary Results"*); see 19 U.S.C. § 1677b(b) (1988) (directing ITA to employ constructed value if sufficient quantities of home market sales are made below cost of production).

ITA's questionnaire requested duty-inclusive data, which respondents provided without identifying specific amounts attributable to duties. *Certain Welded Stainless Steel Pipe from the Republic of Korea*, 57 Fed. Reg. 53,693, 53,697 (Dep't Comm.1992) (final determ. of LTFV sales) (*"Final Results"*). ITA issued a preliminary affirmative determination of LTFV sales on June 22, 1992.[1] *Preliminary Results*, at 27,731. On November 12, 1992, a final affirmative determination of LTFV sales was published. *Final Results*, at 53,693. An antidumping duty order followed. 57 Fed.Reg. 62,301 (Dep't Comm.1992) (antidumping duty order & clarification of final determ.).

The final determination adjusted U.S. price upward to account for import duties rebated by the home market country. *Preliminary Results*, at 27,732–33; *Final Results*, at 53,693 (adopting methodology in preliminary results). ITA did not require a showing that exported pipe was made exclusively with imported materials on which the manufacturers paid duties. *Final Results*, at 53,697. Although ITA had asked respondents to state the source of the coil used to produce exported pipe, respondents were unable to do so.[2] The verification report noted,

the production department does not track raw materials inventory by "domestic" or "foreign" steel, nor does it note which source of steel is used to fill specific sales.... Therefore, the amount of duty included in the material costs would represent an average of all duties paid on coil of specific dimensions. The amount of duty rebated upon exportation of pipe may differ from the amount of duty reported in that pipe's CV [constructed value]. Accordingly, the duty reported in CV may not equal the amount rebated.

Pub.Doc. 158, at 4, *reprinted in* Defendant's Appendix. ITA found that the duty draw-

---

1. The International Trade Commission reached a preliminary affirmative determination of injury in January 1992. *Certain Welded Stainless Steel Pipes from the Republic of Korea and Taiwan*, USITC Pub. 2474, Inv. Nos. 731–TA–540 and 541, at 1 (Jan. 1992) (prelim. determ.).

2. Pub.Doc. 73, Attachment 1, at 2, *reprinted in* Public Appendix to Defendant's Memorandum in Opposition to Plaintiffs' Motion for Judgment upon the Administrative Record ("Defendant's Appendix") (requesting source data); Pub.Doc. 158, at 4, *reprinted in* Defendant's Appendix (finding no information as to source).

back procedure was not arbitrary, explaining that each export permit entitling a manufacturer to a drawback is linked to an import permit certifying payment of duties.[3] *See Final Results*, at 53,696. ITA granted the duty drawback adjustment without determining whether the foreign market value included the cost of duty. *Id.* at 53,696–97.

To calculate constructed foreign market value, ITA accepted respondents' raw material costs derived from a conversion formula for pipe weight. *Id.* at 53,694. Avesta argued that the weight data were flawed because the formula utilized the thickness of the coil used as raw material rather than thickness of the finished pipe. *Id.* at 53,704. ITA rejected this argument and accepted respondents' data because the conversion calculations appeared sound and the same method was used in the manufacturers' internal bookkeeping system. *Id.* It stated, "[a]bsent convincing evidence that the calculation methodology biases the dumping calculation, we may not disregard [respondent's] approach." *Id.*

Finally, ITA adjusted U.S. price upward for value-added taxes ("VAT") paid on home market goods but did not analyze the data to determine whether the cost of the tax was passed through to the home market customer. *Id.* at 53,698. ITA also made a circumstance of sale adjustment to foreign market value based on VAT-related issues. *Id.* Final dumping margins ranged between 2.55 and 7.75 percent. *Id.* at 53,705. Avesta now challenges these results.

## DISCUSSION

### I. Duty Drawback Adjustment to U.S. Price

■ Section 772(d)(1)(B) of the Tariff Act of 1930, as amended, provides for an upward adjustment to United States price, often referred to as a "duty drawback" [4] adjustment, as follows:

(d) The purchase price and the exporter's sales price shall be adjusted by being—

(1) increased by—

. . . .

(B) the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States.

19 U.S.C. § 1677a(d)(1)(B) (1988); *see also* 19 C.F.R. § 353.41(d)(1)(ii) (1992).

Avesta argues that ITA applied the statute improperly by adjusting U.S. price without first determining the extent to which foreign market value was duty-inclusive. The statute provides for the duty drawback adjustment without reference to any finding that the home market price is reflective of duties. *See* 19 U.S.C. § 1677a(d)(1)(B).

ITA has formulated a two-prong test to determine whether a party is entitled to a drawback adjustment: 1) "that the import duty and rebate are directly linked to, and dependent upon, one another" and 2) that the company claiming the adjustment can "demonstrate that there were sufficient imports of the imported raw material to account for the duty drawback on the exports of the manufactured product." U.S. Int'l Trade Admin., U.S. Dep't of Comm., *Study of Antidumping Adjustments Methodology and Recommendations for Statutory Change* 26 (1985). The Court of International Trade has consistently upheld ITA's two-prong test in prior decisions. *See Far East Mach. Co. v. United States*, 12 CIT 972, 979, 699 F.Supp. 309, 315 (1988) ("*Far East Mach. II* "); *Far East Mach. Co. v. United States*, 12 CIT 428, 431, 688 F.Supp. 610, 612 (1988) ("*Far East Mach. I* "); *Carlisle Tire & Rubber Co. v.*

---

**3.** The Korean drawback system generally works as follows: first, the Korean importer pays customs duties on imported raw materials and receives an import permit. Next, the pipe is manufactured and exported under an export permit. After determining which grades of imported coil would have been used to produce exported pipe, the manufacturer matches the export permit with an import permit covering the appropriate grade of coil. The government confirms the match and deposits the drawback in the manufacturer's bank account. Pub.Doc. 167, at 18–21, *reprinted in* Defendant's Appendix.

**4.** The remission or rebate of import duties upon exportation of merchandise is known as a "duty drawback." *See* 19 U.S.C. § 1313(a) (1988).

*United States*, 11 CIT 168, 171, 657 F.Supp. 1287, 1289–90 (1987).

The focus of the first part of this test, establishing a link between an import duty and a rebate, requires ITA to analyze whether the foreign country in question makes entitlement to duty drawbacks dependent upon the payment of import duties. *Far East Mach. II*, 12 CIT at 974, 699 F.Supp. at 311; *Far East Mach. I*, 12 CIT at 431, 688 F.Supp. at 612. In the case at bar, there has been no dispute that the first prong of the test has been met. ITA confirmed, at verification, that pursuant to the Korean rebate system duties on imported raw materials were, in fact, paid and rebated only upon export of the manufactured product. *Final Results*, at 53,696. Furthermore, this determination is consistent with prior decisions of this court involving the general functioning of duty rebate system of Korea. *See Carlisle*, 11 CIT at 172, 657 F.Supp. at 1290.

■ The second prong of the test focuses more specifically on the respondents' conduct and requires the foreign producer to demonstrate that it has imported a sufficient amount of raw materials to account for the drawback received upon export of the finished product. *Far East Mach. II*, 12 CIT at 974, 699 F.Supp. at 311–12. ITA must limit duty rebate adjustments to the actual amount of duties imposed. *Id.* at 974–75, 699 F.Supp. at 312. ITA's review of the drawback applications and import permits of respondents indicate that sufficient imports of steel coils existed for the claimed exported amounts of finished pipe. *Final Results*, at 53,696.

In reaching its determination with respect to duty drawback, ITA utilized "substitution principles" to relieve it of the "difficult, if not impossible, task of determining whether the raw materials used in producing the exported merchandise actually came from imported or domestic sources." *Far East Mach. I*, 12 CIT at 431, 688 F.Supp. at 612. This court has upheld ITA's methodology and use of the substitution principles in stating that "there is no requirement that specific input be traced from importation through exportation before allowing drawback on duties paid." *Far East Mach. II*, 12 CIT at 975, 699

F.Supp. at 312. Avesta argues, nonetheless, that ITA should have calculated an average rate of duty for all raw materials utilized (both dutied and non-dutied) and used that as a cap on the adjustment. Its alternative argument is that ITA should have allocated the total amount of duties rebated among worldwide sales before granting an adjustment. As a matter of policy in drawback cases, ITA does not require exporters to account for a sufficient amount of imported product to cover all products sold to third countries, as well as to the United States. *Certain Circular Welded Carbon Steel Pipes and Tubes from Taiwan*, 53 Fed.Reg. 41,218, 41,220 (Dep't Comm.1988) (final admin. review) (citing *Certain Carbon Steel Butt–Weld Pipe Fittings from Taiwan*, 51 Fed.Reg. 37,-772, 37,773 (Dep't Comm.1986) (final determ. of LTFV sales) (deliberately limiting the investigation of imports for duty drawback purposes to United States imports)). Although expressing some concern, the Court of International Trade rejected a similar argument suggesting the need for such a broad inquiry and upheld ITA's method of investigation as an exercise of administrative discretion. *Far East Mach. II*, 12 CIT at 979, 699 F.Supp. at 315. ITA has exercised such discretion in this case and concluded that the information collected was sufficient, and that the Korean export rebate system as regards steel pipes was adequate to allow an adjustment to U.S. price.

As concerns either raw materials or sales, there is no requirement that ITA match overall rebates to overall duties to achieve balanced numbers on both sides of the comparison. The statute allows a full upward adjustment to U.S. price for duties "which have been rebated." 19 U.S.C. § 1677a(d)(1)(B). ITA's determination is not inconsistent with the statute. Its duty drawback adjustment to U.S. price is sustained.

## II. Reliance on Respondents' Cost Data

■ Where the prices for more than 90% of respondents' sales of a given model fell below the cost of production, ITA calculated foreign market value according to constructed value. *Final Results*, at 53,694. The components of constructed value include the

material costs and fabrication costs of the merchandise. 19 U.S.C. § 1677b(e)(1)(A) (1988). Fabrication costs were established based on a calculated weight for pipe sold, using a standard industry formula that includes as factors the wall thickness of the input material, the diameter and length of the pipe, and an industry steel grade weight. Pub.Doc. 158, at 12, *reprinted in* Defendant's Appendix. Avesta argues that this formula does not accurately represent the cost per ton of pipe because the wall thickness of input coil may not equal the wall thickness of output pipe. The formula is standard in the industry and used by respondents in these financial records. It is simply a way to get from pipe sold by length to a weight figure for such pipe.

Application of the formula, thus, results in the classification of pipe according to weight grades. *Id.* at 12. Each grade of pipe can be manufactured using steel with a wall thickness of plus or minus 10% of the grade specifications. *Id.* at 16–17; *see also* Conf. Doc. 8, at 491 ("Tolerance for Wall Thickness"), *reprinted in* Confidential Appendix to Defendant's Memorandum in Opposition to Plaintiffs' Motion for Judgment upon the Administrative Record, Doc. 1. The fact that the weight of the particular input coil may change slightly as a result of the manufacturing process is already accounted for in the conversion formula.[5] Any costs associated with scrap produced by the manufacturing process are also accounted for elsewhere. *See Final Results,* at 53,705. Plaintiffs have not demonstrated any error in this regard.

### III. Use of Duty-inclusive Data to Calculate Constructed Value

■ Avesta also requests a remand with respect to the calculation of constructed for-

eign market value based on duty-inclusive data. ITA agrees, if solely for the purpose of explaining its seemingly contradictory methodologies.[6] Respondents, on the other hand, request that the motion for remand with respect to the calculation of constructed value be denied. Defendant–Intervenors' Reply to Defendant's Opposition, at 14.[7] As indicated, respondents submitted duty-inclusive data without identifying specific amounts attributable to duties. *Final Results,* at 53,-697. ITA used these amounts in calculating constructed value. *Id.* In a prior determination also involving steel pipe from Korea, ITA requested data exclusive of duties and applied the best information available ("BIA") when duty-inclusive data were provided.[8] *Circular Welded Non–Alloy Steel Pipe from the Republic of Korea,* 57 Fed. Reg. 42,942, 42,951–52 (Dep't Comm.1992) (final determ. of LTFV sales). ITA stated that the respondents' format did not "identif[y] the amount of duty reported in the material cost of the specific pipe, thus making it impossible for us to exclude the duty from the reported CV." *Id.* at 42,951.

ITA's final determination herein states that the discrepancy between constructed value calculations in this case and the prior case was due to the fact that ITA "did not request that respondents in this investigation report CV exclusive of import duties, as [it] did in the Circular Welded Pipe from Korea case." *Final Results,* at 53,697. ITA concluded that the adjustment to U.S. price for duty drawback when compared to constructed value was appropriate because respondents acted in accordance with ITA's explicit instructions. *Id.* ITA also stated that "it is

---

5. *See Circular Welded Non–Alloy Steel Pipe from the Republic of Korea,* 57 Fed.Reg. 42,942, 42,-945 (Dep't Comm.1992) (final determ. of LTFV sales) (using weight data based on coil thickness despite recognition that data may under- or overstate actual weight of pipe).

6. On October 27, 1993 ITA stated at oral argument that if the court finds no error, a remand is unnecessary.

7. Respondents filed on August 31, 1993 a Motion for Leave to Reply to Memorandum of Defendant United States in Opposition to Plaintiffs' Motion

for Judgment Upon the Administrative Record. The court grants this motion. Plaintiffs' Motion for Leave to Reply to Defendant's Partial Opposition to Plaintiffs' Motion for Remand, filed on November 10, 1993, is also granted.

8. Commerce is required to use BIA if it is "unable to verify the accuracy of the information submitted" or "whenever a party … refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation." 19 U.S.C. § 1677e(b); (c) (1988).

common practice ... to calculate CV based on average costs, and compare the CV to USP [U.S. price], which is based on transaction-specific charges." *Id.* It is clear that ITA has already fully evaluated its methodology used in calculating constructed value in its final determination of this case. No error was demonstrated in the methodology used here and, thus, there is no need for further explanation. ITA may or may not have had a good reason for requesting duty-exclusive data in the prior case. Its actions in that case do not represent a consistent past practice, deviation from which must be explained. Thus, whether or not ITA erred in the prior case is not determinative here. Avesta's request for remand on this issue is denied.[9]

### IV. Adjustments for VAT

■ The request of Avesta and ITA for remand regarding a circumstance of sale adjustment for VAT is granted. ITA acknowledges that the Federal Circuit has disapproved ITA's practice of making a circumstance of sale adjustment to foreign market value to account for VAT. *See Zenith Elecs. Corp. v. United States,* 988 F.2d 1573, 1581 (Fed.Cir.1993). On the other hand, the Federal Circuit has upheld VAT adjustments made to U.S. price without the benefit of an econometric or pass through analysis, as was the case here. *See Daewoo Elecs. Co. v. United States,* 6 F.3d 1511 (Fed.Cir.1993) (motion for rehearing pending). This case will therefore be remanded for a recalculation of foreign market value, eliminating the circumstance of sale adjustment.

In addition, plaintiffs have requested specific remand instructions directing ITA to eliminate the circumstance of sale adjustment and forbidding ITA from changing its U.S. price adjustment methodology from that used to date in this matter. Apparently,

following *Zenith,* ITA amended its U.S. price methodology to add to U.S. price the actual amount of VAT taxes paid, as opposed to adding an amount based on an *ad valorem* tax rate as applied to export sales. This new methodology was suggested in *Zenith.* 988 F.2d at 1582, n. 4.

Plaintiffs argue that *Federal–Mogul Corp. v. United States,* 834 F.Supp. 1391 (1993), rejects this approach across the board, relying on statutory language and the body of *Zenith,* particularly the statement that "[t]itle 19 explicitly requires Commerce to increase USP by the amount of tax that the exporting country *would have assessed on the merchandise if it had been sold in the home market."* *Federal–Mogul,* 834 F.Supp. at 1396 (quoting *Zenith,* 988 F.2d at 1580 (emphasis as per *Federal–Mogul* )).

*Federal–Mogul* does appear to reject ITA's approach. It seems to the court, however, that the underlined language does not address whether ITA is permitted to use the actual amount of taxes paid, perhaps because that issue was not before the Court of Appeals. Under ITA's new approach, U.S. price would be increased "by the amount of tax that the exporting country would have assessed on the merchandise if it had been sold in the home market," *at home market prices.* The approach approved in *Federal–Mogul* would require a U.S. price adjustment by percentage of U.S. price, which treats the merchandise as "if it had been sold in the home market," at its actual price. Thus, neither approach conflicts directly with the key sentence in the body of *Zenith.* *Federal–Mogul* 's construction is, however, in agreement with the wording of 19 U.S.C. § 1677a(d)(1)(C).[10] The court has difficulty finding such agreement in ITA's construction.

---

9. This decision is consistent with previous opinions of this court requiring a showing of error before remand is granted. *See Smith Corona Corp. v. United States,* 11 CIT 954, 959, 678 F.Supp. 285, 288–89 (1987); *Badger–Powhatan v. United States,* 10 CIT 241, 244–45, 633 F.Supp. 1364, 1368–69, *appeal dismissed,* 808 F.2d 823 (Fed.Cir.1986).

10. The statute provides that U.S. price shall be increased by:

(C) the amount of any taxes imposed in the country of exportation directly upon the exported merchandise or components thereof, which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States, but only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation.

19 U.S.C. § 1677a(d)(1)(C).

Contrary to defendant's position the word "amount" in the statute does not resolve the issue, as an "amount" will result from application of an *ad valorem* rate as well as ITA's method. Also, footnote 4 of *Zenith* does indeed appear to be *dicta*, as the issue of how to accomplish the U.S. price adjustment was not before the court. It is a troubling footnote, however, as it is a clear statement to ITA that it is *permitted* to do something. It is not a statement, however, that ITA *must* do something. Furthermore, just because ITA's methodology may satisfy the "but only" clause of the statute does not mean that some other methodologies, including the one approved in *Federal–Mogul*, may not better satisfy the statute as a whole.

The court is concerned that ITA may not be considering this matter carefully enough in light of *Federal–Mogul* and has chosen a tortured reading of the statute, which puts the court in the awkward position of rejecting a clear statement of the Court of Appeals or a well-reasoned opinion of this court that applies plain statutory language. ITA, on the other hand, may choose to follow *Federal–Mogul* without running afoul of the permissive language of footnote 4.. Thus, ITA is directed to reconsider this issue and shall advise the court by December 6, 1993 as to whether it is acquiescing or whether it is appealing the *Federal–Mogul* line of cases. At that time the court will provide appropriate further remand directions.

*CONCLUSION*

In conclusion, plaintiffs' motion for judgment on the agency record is granted in part and denied in part. ITA's determination with respect to the use of duty-inclusive data in constructed value calculations and duty drawback adjustments is sustained. ITA's reliance on respondents' cost data regarding the theoretical weight of the merchandise is sustained. This case is remanded to ITA for a recalculation of foreign market value with no adjustment for VAT and for reconsideration of its VAT U.S. price methodology.