INDEPENDENT RADIONIC WORKERS OF AMERICA, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

Slip Op. 94–144.
No. 86–12–01551.

United States Court of International Trade.

Sept. 16, 1994.

Collier, Shannon, Rill & Scott, Paul D. Cullen, Jeffrey S. Beckington, Mary T. Staley, David C. Smith, Jr. and Gail S. Usher, Washington, DC, for plaintiffs Independent Radionic Workers of America, the Intern. Broth. of Elec. Workers, the Intern. Union of Electronic, Elec., Technical, Salaried and Machine Workers (AFL–CIO) and the Indus. Union Dept. (AFL–CIO).

Frederick L. Ikenson, P.C., Frederick L. Ikenson, Larry Hampel and Joseph A. Perna, V, Washington, DC, for plaintiff-intervenor Zenith Electronics Corp.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Washington, DC (Velta A. Melnbrencis, Priya Alagiri, Atty. Advisor, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, of counsel), for defendant.

Akin, Gump, Strauss, Hauer & Feld, L.L.P., Sukhan Kim, Warren E. Connelly, P.C. and Margaret L.H. Png, Washington, DC, for defendants-intervenors Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.

## OPINION

RESTANI, Judge:

This matter is before the court on three motions pursuant to USCIT Rule 56.2 for judgment upon the agency record. The motions have been brought by (1) the Independent Radionic Workers of America, the International Brotherhood of Electrical Workers, the International Union of Electronic, Electrical, Technical, Salaried and Machine Workers (AFL–CIO) and the Industrial Union Department (AFL–CIO) (collectively "the Unions"), (2) Zenith Electronics Corporation, and (3) Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (collectively "Samsung"). To facilitate adjudication of the issues, the court has consolidated these separate challenges to the determination of the International Trade Administration of the United States Department of Commerce ("ITA" or "Commerce") in *Color Televisions Receivers from Korea,* 51 Fed. Reg. 41,365 (Dep't Comm.1986) (second final admin. review).

### Standard of Review

■ As this consolidated action constitutes a challenge to the final determination of an administrative review, the applicable standard of review is whether the final determination is supported by substantial evidence on the record and is otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1988).

## Discussion

### I. Adjustment for value-added taxes and assumption of pass-through

In its final determination, Commerce chose to account for home market value-added taxes ("VAT") forgiven as a result of exportation by "subtract[ing] the full amount of these taxes from foreign market value." 41 Fed. Reg. at 41,365. The governing statute, in contrast, directs an increase to United States price ("USP") for rebated or uncollected VAT up to the amount of VAT added to the price of similar merchandise sold in the home country. 19 U.S.C. § 1677a(d)(1)(C) (1988). The Federal Circuit's decision in *Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1581 (Fed.Cir.1993), holds that the adjustment must be made to USP, not to foreign market value ("FMV"). *See also Avesta Sheffield, Inc. v. United States*, 838 F.Supp. 608, 614 (Ct.Int'l Trade 1993). Commerce has acknowledged that a remand is necessary to correct the error by increasing Samsung's FMV to its former value and making an appropriate adjustment to USP.

In order to comply with *Zenith*, Commerce has implemented a revised methodology to adjust USP for VAT. *See Ferrosilicon from Brazil*, 59 Fed.Reg. 732, 733 (Dep't Comm. 1994) (final determ. of sales at less than fair value). To determine the amount that is to be added to USP, Commerce currently applies the home market tax rate to the exported merchandise at the same point in the U.S. chain of commerce at which the foreign tax is applied to home market sales. *Id.* Commerce then "adjust[s] the USP tax adjustment and the amount of tax included in FMV" to account for expenses deducted in calculating FMV and USP. *Id.* This secondary adjustment to the taxes is designed to "prevent the new methodology ... from creating antidumping duty margins where no margins would exist if no taxes were levied upon foreign market sales." *Id.* This methodology was recently upheld by the court in *Torrington Co. v. United States*, 853 F.Supp. 446, 448–49 (Ct.Int'l Trade 1994). The court

accepts Commerce's acknowledgement of its error on this point and remands the determination for Commerce to reinstate the original FMV value and to adjust USP in accordance with its new methodology.[1]

In calculating the VAT adjustment, Commerce assumed a full pass-through for the merchandise on review. 51 Fed.Reg. at 41,365. The Federal Circuit has held that Commerce is not required to measure pass-through and the Supreme Court has declined to review the issue. *Daewoo Elecs. Co. v. United States*, 6 F.3d 1511, 1517 (Fed.Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2672, 129 L.Ed.2d 808 (1994); *see also Chang Tieh Indus. Co. v. United States*, 840 F.Supp. 141, 147 (Ct.Int'l Trade 1993). Therefore, on remand, Commerce is not required to measure pass-through in recalculating the VAT adjustment.

### II. Treatment of certain sales as purchase price or exporter's sales price transactions

Under the applicable statute, USP "means the purchase price ["PP"], or the exporter's sales price ["ESP"], of the merchandise, whichever is appropriate." 19 U.S.C. § 1677a(a) (1988). The ESP is "the price at which merchandise is sold or agreed to be sold in the United States, *before or after* the time of importation." *Id.* § 1677a(c) (1988) (emphasis added). The statute defines PP as "the price at which merchandise is purchased, or agreed to be purchased, *prior* to the date of importation." *Id.* § 1677a(b) (1988) (emphasis added).

During the review period, the U.S. subsidiary of Samsung Electronics Co., Samsung Electronics America, arranged sales of Korean televisions to unrelated customers. 51 Fed.Reg. at 41,365. These purchases were arranged prior to the importation of the products. *Id.* Commerce's consistent practice at that time was to delineate between PP transactions and ESP sales based upon when

---

1. Although Zenith and the Unions accept the application of the new methodology, Samsung argues that this court should leave Commerce "free to apply a methodology which complies with the Federal Circuit's eventual directive."

Def.–Ints.' Resp. Br. Opp'n to Pls.' Mot. J. Agency R. at 6. This matter is now well-settled in this court and no purpose would be served by reopening the issue.

they were completed. *See PQ Corp. v. United States,* 11 CIT 53, 60 & n. 8, 652 F.Supp. 724, 731 & n. 8 (1987). Sales made to an unrelated buyer prior to importation were automatically classified as PP transactions. *Id.* As a result, Commerce treated the sales at issue as PP transactions rather than ESP sales. *See* 51 Fed.Reg. at 41,365.

In 1987, two months after the challenged determination was published, this court issued its opinion in *PQ Corp.* The court held that "[t]he mere fact that a sale was made prior to importation does not provide a sufficient basis for applying PP rather than ESP.... Thus, where a sale is made to an unrelated party prior to importation, the determination of whether PP or ESP applies must be based upon additional circumstances." *PQ Corp.,* 11 CIT at 60, 652 F.Supp. at 731.

■ In response to the holding of *PQ Corp.,* Commerce developed a test to determine and consider the "additional circumstances" that this court had specified were necessary to support a finding that a sale to an unrelated party was a PP transaction. Under this three-part test,

> [ (1) ] the manufacturer must ship the merchandise directly to the unrelated buyer, without introducing it into the related selling agent's inventory. [ (2) ] This procedure must be the customary sales channel between the parties. [ (3) ] The related selling agent located in the United States must act only as a processor of documentation and a communication link with the unrelated buyer.

*Borusan Holding A.S. v. United States,* 16 CIT 278, 281, 1992 WL 82493 (1992) (footnote omitted). The Unions contend that Commerce should be directed on remand to classify these sales as ESP transactions. Commerce also requests a remand to allow it to consider "additional circumstances" in determining whether PP or ESP should apply. Samsung protests that this court should not apply the holding in *PQ Corp.* or the subsequently developed test because Commerce's determination was in accordance with its practice at the time of the review period.

Samsung believes that a remand would be a retroactive application of the law and asserts that it would be prejudiced thereby.

■ This court must apply the law now in effect, "unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Bradley v. Sch. Bd.,* 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). Samsung's reliance on *National Corn Growers Ass'n v. Baker,* 840 F.2d 1547, 1555 (Fed.Cir. 1988), for the proposition that Samsung had a right to rely on administrative practice at the time it structured export sales is unavailing. Commerce's administrative practice "still must be lawful, which is for the courts finally to determine." *Brother Indus., Ltd. v. United States,* 15 CIT 332, 338, 771 F.Supp. 374, 381 (1991). In *PQ Corp.* this court determined that distinguishing between PP and ESP transactions solely on the basis of timing was unlawful.

Therefore, a remand is ordered on this issue so that Commerce may, in accordance with the statute, determine whether Samsung's sales are to be treated as PP or ESP transactions once it has reviewed the additional circumstances required by *PQ Corp.* To avoid prejudice to Samsung, Commerce should allow Samsung the opportunity to offer evidence to support its claim for PP treatment.[2]

### III. Adjustments to exporter's sales price transactions for U.S. commissions and indirect selling expenses

Pursuant to 19 U.S.C. § 1677a(e)(1) and (2) (1988), adjustments to ESP should be made to reflect

> (1) commissions for selling in the United States the particular merchandise under consideration, [and]
>
> (2) expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise ["indirect expenses"].

*Id.* Under the regulations, an offset adjustment is made to FMV to account for differences in commissions and, in ESP transac-

---

**2.** None of the parties objects to reopening of the record for this purpose.

tions, indirect selling expenses. 19 C.F.R. § 353.56(b)(1), (2) (1994).

Samsung employed commissioned agents in the United States to sell its merchandise. 51 Fed.Reg. at 41,365–66. Samsung claimed an adjustment to its ESP sales for the amount of the commissions paid to these agents and for the indirect selling expenses incurred. *Id.* Believing adjustments to ESP had been made, Commerce authorized an offset to FMV pursuant to its regulations. *See* 19 C.F.R. § 353.56(b). Commerce now admits that it failed to make the original adjustments to ESP. Thus, remand is ordered to allow Commerce to recalculate ESP, accounting for U.S. commissions and U.S. indirect selling expenses.[3]

## IV. Offset of imputed credit expense formula

■ The statutory section relating to circumstances of sale ("COS"), provides:

> In determining foreign market value, if it is established to the satisfaction of the administering authority that the amount of any difference between the United States price and the foreign market value . . . is wholly or partly due to—
>
> . . . ;
>
> (B) other differences in circumstances of sale; . . .

then due allowance shall be made therefor. 19 U.S.C. § 1677b(a)(4) (1988). Pursuant to this provision Commerce adjusted the FMV of Samsung's merchandise for credit expenses. 51 Fed.Reg. at 41,366–67. A credit expense occurs when a seller sells the merchandise on credit and in doing so incurs an expense during the period for which it has not been paid for the merchandise.

In order to calculate Samsung's credit expenses, Commerce used an imputed credit expense formula. *Id.* Commerce measured the average duration of accounts receivable to determine the average period for which Samsung needed to obtain working capital financing to cover the sales it had made on credit. *See id.* The Korean Government's

policy not to collect excise taxes on the merchandise immediately after the sale prompted Commerce to mitigate its calculation of the credit expense adjustment to account for the average time between payment of taxes and the receipt of payment. *Id.* at 41,366. Thus, the number of days used by Commerce to calculate the credit expense was reduced by those days during which the taxes were unpaid.

The Unions maintain that Commerce's calculation of the credit expense should be further offset by the average duration of accounts payable. The Unions assert that a delay in payment to suppliers affects the short-term capital requirements by reducing the need for working capital financing. Furthermore, the Unions contend that Commerce's decision not to take into account the average duration of accounts payable is inconsistent with the offset for the lag time between the sale and payment of taxes.

Both Samsung and Commerce rely upon the holding in *Federal–Mogul Corp. v. United States,* 839 F.Supp. 881 (Ct.Int'l Trade 1993), as rejecting the Unions' contention that home market selling expenses should be used to offset a COS adjustment to FMV. In *Federal–Mogul,* the ITA on remand determined that a COS adjustment should not be reduced by the delay in payment of home market selling expenses, *i.e.,* the duration of accounts payable. *Id.* at 884–85. The ITA reasoned that an adjustment for delayed payment would not be reasonably identifiable and quantifiable, as required by the legislative history. *Id.* at 885 (quoting H.R.Rep. No. 317, 96th Cong., 1st Sess. 76 (1979)).

Commerce also asserted in *Federal–Mogul* that its practice was in accordance with the applicable regulation, which allowed for adjustments for differences in selling costs that are "assumed by the producer or reseller on behalf of the purchaser from that producer or reseller." 19 C.F.R. § 353.56(a)(2) (1991). Commerce believed that an adjustment for credit expenses satisfied this relationship, while an adjustment for accounts payable "would involve imputing expenses incurred

---

**3.** The Unions have chosen not to pursue their initial challenge to ITA's decision to combine the ESP offset with the commission offset.

not between the buyer and seller, but *between the seller and supplier.*" *Federal–Mogul,* 839 F.Supp. at 885 (quoting Final Results of Redetermination Pursuant to Court Remand (Sept. 2, 1993), at 10–11). The court concluded that the ITA "is not required to factor in the effects of delayed payment of home market selling expenses on these COS adjustments." *Id.* at 886. The court does not find the Unions' distinction of *Federal–Mogul* to be viable. Thus, Commerce is not required to offset the COS adjustment for credit expenses by the average duration of accounts payable.

## V. Samsung's advertising and warranty expenses

■ Commerce made an adjustment to Samsung's FMV for home market advertising and warranty expenses pursuant to the regulations at that time, which stated that "*reasonable* allowances generally will be made ... involving differences in credit terms, guarantees, *warranties,* ... and assumption by a seller of a purchaser's *advertising* or other selling costs." 19 C.F.R. § 353.15(b) (1986) (emphasis added) (currently codified at 19 C.F.R. § 353.56(a)(2) (1994)). Commerce reviewed Samsung's sales for the period of April 25, 1984 to March 31, 1985. Due to the nature of these expenses, Samsung was unable to provide a daily breakdown of its advertising and warranty expenditures or to link these figures to specific sales. As a result, Samsung provided Commerce with monthly totals for these expenses.

Commerce chose to prorate "advertising expenses, which includes expenses outside the review period[,] over sales made during that same period." 51 Fed.Reg. at 41,367. Commerce concluded that "[b]ecause an advertising claim is by nature not sales-specific, a reasonable estimate is acceptable." *Id.* With regard to warranty expenses, Commerce stated that "[b]ecause Samsung allocated its home market warranty expenses over sales during the same time period, we believe that Samsung's claimed adjustment accurately reflects its expenses for the review period." *Id.*

The Unions protest that Commerce's methodology in determining these expenses is unlawful because Commerce used expenses in its calculation that occurred outside of the review period. The Unions argue that this methodology may have allowed Samsung to manipulate the determination by artificially decreasing its dumping margins, because the April expenses were uncharacteristically high. They request that the court remand this determination to require Commerce to recalculate Samsung's advertising and warranty expenses by eliminating the April expenses altogether.

The court agrees that these expenses are of a nature that prevents a sales-specific calculation. *See Smith–Corona Group v. United States,* 713 F.2d 1568, 1581 (Fed.Cir. 1983) ("In a purely metaphysical sense, ... ad expense cannot be directly correlated with specific sales."), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). Thus, some allocation must be made in order to follow the regulations. Furthermore, this allocation methodology is not contrary to Commerce's standard practice. In fact, Commerce has used a pro rata allocation method in other determinations. *See, e.g., Porcelain-on-Steel Cooking Ware from Mexico,* 55 Fed.Reg. 21,061, 21,061–62 (Dep't Comm.1990) (final admin. results) (allocating aggregate commission expenses over all sales instead of linking actual expenses to individual sales).

In *Smith–Corona,* the Federal Circuit upheld a reasonable allocation methodology to determine advertising expenses. 713 F.2d at 1581–82. In *Smith–Corona,* certain advertisements for the subject merchandise also promoted other products or included commemorative announcements. *Id.* at 1581. The court upheld ITA's attempts to "isolate that portion of advertising expense that was properly adjustable," *id.,* as the allocation was made "on the basis of actual, verified cost data." *Id.* at 1582. In this case, Commerce has verified the cost data for Samsung's advertising and warranty expenses, *see* Def.'s Mem. Partial Opp'n to Def.–Ints.' Mot. J. Agency R., Conf.App., Ex. 1, at 34–42, and has made a reasonable allowance for those expenses by prorating them over the six days

included in the review period. Its methodology is therefore sustained.

## VI. Indirect versus Direct Selling Expenses

### A. Credit Sale Rebates

■ Samsung granted rebates to its home market distributors who sold to consumers on credit pursuant to a rebate program known as Shin Yong Pan Mae ("SYPM"). To calculate a per unit amount of the rebate, Samsung divided the total amount of rebates paid on the subject merchandise by the total amount of sales revenue for the subject merchandise. Samsung then multiplied the resulting percentage by the price of each individual home market sale under investigation.

Commerce treated the SYPM rebates as indirect selling expenses, explaining that "[b]ecause in our review we examine sales between the manufacturer and the unrelated dealer, we cannot tie the claimed rebates during the period to the manufacturer's sales during the period." 51 Fed.Reg. at 41,377. The final determination referred back to the results of the first administrative review, id., which stated, "[b]ecause the rebate is triggered by and occurs at the time of sale from the dealer to the end user, the rebate could occur at any time subsequent to the sale from the manufacturer to the dealer." *Color Television Receivers from Korea*, 49 Fed. Reg. 50,420, 50,427 (Dep't Comm.1984) (final admin. review). The first review determination likewise characterized the SYPM rebates as indirect. *Id.*

Congress intended that the foreign market value be adjusted for differences in circumstances of sale that are "directly related to the sales under consideration." H.R.Rep. No. 317, at 76. If USP is being determined on the basis of exporter's sales price, additional adjustments may be made for indirect selling expenses, *i.e.,* "expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise." 19 U.S.C. § 1677a(e)(2).

The Federal Circuit has concluded that the use of an appropriate allocation methodology "does not deprive . . . rebates of their direct relationship to the sales under consideration." *Smith–Corona,* 713 F.2d at 1580. The methodologies deemed appropriate by the Federal Circuit included "apportioning the expense among the various models sold and dividing by the quantity of each model sold" and dividing the total amount of the rebate by the total number of products sold subject to rebate. *Id.* The reasonableness of these methodologies was derived in part from the facts that the rebates were actually paid, the effective cost to the manufacturer was increased by the amount of the rebates, and the apportionment was made on the basis of actual, verified data. *Id.*

This court has distinguished *Smith–Corona* in circumstances where (1) the manufacturer's actual cost data does not establish a direct link between a rebate and the sale of merchandise within the scope of investigation and (2) rebates were not assessed as a fixed percentage of sales. *NSK Ltd. v. United States,* 843 F.Supp. 1503, 1505 (Ct.Int'l Trade 1994); *Koyo Seiko Co. v. United States,* 16 CIT 539, 542–43, 796 F.Supp. 1526, 1530 (1992).

In *NSK,* the manufacturer sold in-scope and out-of-scope merchandise, keeping records of discounts on a customer-specific rather than product-specific basis. 843 F.Supp. at 1505. Discounts were allocated to in-scope merchandise by applying "a ratio of total discount to total sales for each customer." *Id.* The court found that in the absence of evidence that the manufacturer offered the same discounts on in-scope merchandise as on out-of-scope merchandise, use of such an allocation methodology was inappropriate. *Id.* Commerce's treatment of the discounts as indirect selling expenses was sustained. *Id.*

In *Koyo Seiko,* this court noted that "the rebates in *Smith–Corona* were granted as a straight percentage of sales, regardless of the models sold." 16 CIT at 542, 796 F.Supp. at 1530. In contrast, the post-sale price adjustments at issue in *Koyo Seiko* varied from product to product and sale to sale. *Id.* The court found that under those circumstances, where the adjustments could not be directly linked to specific sales through verified data, the adjustments were

properly classified as indirect selling expenses. *Id.* at 542–43, 796 F.Supp. at 1530.

Commerce, the Unions and Zenith argue in this case that Samsung has not proven a direct link between the SYPM rebates and the sales under consideration. They assert that rebates granted during the period of investigation may relate to sales occurring before the period began. Commerce also points to Samsung's accounting practice of recording its rebates on a customer-specific rather than a sales-specific basis.

Samsung admittedly could not tie the rebate amount in the response to specific sales, allocating the amount instead. Def.'s Conf. App., Ex. 1, at 28. ITA therefore agreed to examine rebates given to the same distributor for the same model in the month following each of the four specific sales it chose to verify. *Id.* The documents found at verification included invoices of sales to dealers, invoices of installment sales from dealers to end users, and lists of transactions showing the price to the dealer, the amount due from the end user and the amount of each monthly installment. *Id.* at 28–29.

According to the report, the SYPM rebate program applied a specific fixed percentage to the total sales to a dealer in a given month. *Id.* at 29. Although Samsung's ledgers listed total monthly rebate amounts for each distributor, they also segregated rebates by product, allowing the examiners to trace rebate amounts for color televisions only. *Id.* at 29, 31. The examiners verified that the rebates were actually paid as claimed. *Id.* at 31.

The verification report thus belies Commerce's claim that its review was limited to data of sales between manufacturers and dealers, as there was ample information concerning sales from dealers to end-users present in the report. *See* 51 Fed.Reg. at 41,377. Like the allocation methodology approved in *Smith–Corona,* Samsung's method seemed to use a fixed rather than a variable percentage. Because product-specific data on rebates were available, Commerce was able to verify amounts relating exclusively to in-scope merchandise. Given the apparent conflict with

*Smith–Corona* and the absence of any concerns that have led this court to distinguish *Smith–Corona* in the past, the court now finds that Commerce's treatment of the SYPM rebates as indirect selling expenses is unreasonable.

Commerce also argues that the timing of the rebates, not at issue in *Smith–Corona,* precludes their classification as direct selling expenses. As indicated, Commerce found only an indirect connection to sales under investigation because the rebate could occur at any time subsequent to the sale from the manufacturer to the dealer. Samsung contends that Commerce's treatment of the SYPM rebates is inconsistent with its regular practice of allowing warranty expenses, which are often incurred to repair products sold in prior periods, as direct selling expenses.

Samsung raised a similar argument before this court with relation to bad debt expenses in the case involving the first administrative review, *Daewoo Elecs. Co. v. United States,* 13 CIT 253, 257, 712 F.Supp. 931, 938 (1989) (*"Daewoo I "*), *aff'd in part and rev'd in part on other grounds,* 6 F.3d 1511 (Fed.Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2672, 129 L.Ed.2d 808 (1994). In *Daewoo I,* ITA asserted that bad debt expenses were indirect unless they were incurred on sales under review and the debt was written off during the period of investigation. *Id.* Samsung countered that ITA's treatment of bad debt expenses and warranty expenses was thus inconsistent. *Id.*

The court agreed, finding no meaningful distinction

> between warranty expenses, which are supposedly 'always direct,' whether or not they are actually incurred with regard to the sales under review, and bad debt expenses, which are determined to be either 'direct' or 'indirect' depending on whether they are actually incurred with regard to the specific sales under review.

*Id.* at 258, 712 F.Supp. at 939.[4] The court explained that the amount of both types of

---

4. Warranties, unlike bad debt expenses or rebates, are specifically addressed by the regula-

tions. The regulations in effect at the time of the final determination at issue provided that "[e]x-

expenses is not generally known at the time of sale because the amount is by its nature contingent upon future events. *Id.* at 258–59, 712 F.Supp. at 939. According to the court, "[a]bsent any reasonable·indication as to why the estimation of bad debt expenses based on past experience is any less reliable than the use of past experience for warranty expenses, this distinction between them is not proper." *Id.* at 259, 712 F.Supp. at 940.

This court likewise finds no meaningful distinction between warranties and the credit rebates at issue. Because the amount of the rebates depends on the quantity of merchandise ultimately sold on credit by dealers to end users, it is difficult to calculate the rebate amount at the time of the sales from manufacturer to dealer. ITA was nonetheless able to allocate rebate expenses based on verified, reliable cost data for the purpose of calculating indirect selling expenses. The fact that rebates may be granted within a shorter time period than warranty or bad debt expenses would be incurred merely increases the reliability of the information. The court therefore remands this case to Commerce with directions to treat Samsung's SYPM credit rebates as direct selling expenses.[5]

### B. Quantity Discounts or Volume Rebates

■ Samsung claimed a quantity discount for amounts paid to its home market distributors based on a percentage of the total monetary value of merchandise purchased in each month. The percentage rate increased as the monetary value of total purchases increased. Although the percentage rates were applied to total sales of subject and non-subject merchandise, Samsung segregated the amounts paid on color television receivers for purposes of verification. Def.'s

Conf.App., Ex. 1, at 32. ITA verified that these "discounts" were granted on more than twenty percent of Samsung's sales to distributors during eight months of the review period. *Id.*

ITA treated the claimed adjustment for quantity discounts as an indirect selling expense. 51 Fed.Reg. at 41,368. It explained:

> Because the home market sales prices are all individually negotiated—rather than fixed in a price list—the monthly sales value on which the discount is based does not reflect the actual quantity of television receivers purchased. In other words, the discount is not a quantity discount, but a volume rebate.

*Id.*

The statute in effect at the time of the final determination provides for adjustments to FMV if a price differential between USP and FMV "is wholly or partly due to" the difference in the commercial quantities in which the merchandise is sold in the United States and the home market. 19 U.S.C. § 1677b(a)(4)(A) (Supp. III 1985). The implementing regulation directs Commerce to consider home market discounts for quantity sales in making its adjustments. 19 C.F.R. § 353.14(a) (1986).

Special treatment is accorded to manufacturers who grant discounts of at least the same magnitude on 20 percent or more of home market sales for a minimum of six months during the period of investigation. *See id.* § 353.14(b)(1) (1986). If these criteria are fulfilled, ITA deducts the discount price in calculating FMV for all of the manufacturer's sales. *See* Int'l Trade Admin., U.S. Dep't of Comm., *Antidumping Manual, Import Administration* ch. 8, at 43 (July 1993).[6]

---

amples of differences in circumstances of sale for which reasonable allowances generally will be made are those involving differences in ... warranties." 19 C.F.R. § 353.15(b) (1986). The court found that the regulations in no way limited adjustments for direct selling expenses to warranties and other listed examples. *Daewoo I,* 13 CIT at 259–60, 712 F.Supp. at 940.

**5.** The court does not foreclose the possibility that in the future Commerce may articulate a viable reason to treat rebates differently from warranty

expenses·and other expenses which occur after the time period at issue, but it has not done so here. Furthermore, the court does not deem it administratively or judicially efficient to reopen the record at this late date in order for the parties to submit new information on whatever factors ITA might deem relevant.

**6.** The parties do not dispute the applicability of this methodology to the time period at issue.

Volume rebates, as opposed to quantity discounts, are treated as direct selling expenses if they are directly related to the sales under consideration. *See, e.g., Smith–Corona,* 713 F.2d at 1579–81. A quantity discount is normally offered on a single large quantity sale as an up-front reduction in price. *See Silver Reed America, Inc. v. United States,* 12 CIT 39, 47–48, 679 F.Supp. 12, 19, *clarified, on reh'g,* 12 CIT 250, 683 F.Supp. 1393 (1988). A volume rebate is granted at the end of a period for total sales throughout the period. *See Brother Indus., Ltd. v. United States,* 3 CIT 125, 148–49, 540 F.Supp. 1341, 1363 (1982), *aff'd, Smith–Corona,* 713 F.2d 1568.

Samsung's practice of paying a distributor an after-sale amount representing a certain percentage of monthly sales is more characteristic of a volume rebate than a quantity discount. Therefore, the fact that these rebates were granted on more than 20 percent of Samsung's home market sales over an eight-month period is not determinative. *See* 19 C.F.R. § 353.14(b)(1). The regulations concerning quantity discounts do not apply.

A remaining question is whether Samsung has proven these rebates to be directly related to sales under review. Zenith and the Unions argue that the rebates are indirect selling expenses because they were granted on purchases of all merchandise, not just color television receivers. The verification report notes, however, that Samsung submitted data segregating rebate amounts paid on color televisions from rebates on other products. Def.'s Conf.App., Ex. 1, at 32–33. Commerce verified that these amounts were actually credited to the distributors' accounts receivable. Thus, Samsung has satisfied the *Smith–Corona* requirements that rebates are actually paid, the effective cost to the manufacturer is increased by the amount of the rebate, and any apportionment is based on verified cost data. 713 F.2d at 1580. The court hereby directs ITA on remand to treat the amount of volume rebates actually paid on color television sales as a direct selling expense.[7]

## C. Bad Debt Expense

Samsung claimed that its bad debt expenses written off during the period of review were entitled to treatment as direct selling expenses. It seeks remand for a recalculation of the circumstance of sale adjustment to account for bad debt. In the preliminary analysis memorandum, ITA explained:

> We allow only debt which was incurred and written off during the review period. Since the debt was incurred on sales made before the review period, we only allowed a portion of the write-off for sales during the review period. We then determined the resulting adjusted amount to be insignificant and thus disallowed it.

Def.'s Conf.App., Ex. 2, at 1259. Because Samsung made no objection to the preliminary analysis, the issue was not addressed in the final determination.

ITA, Zenith and the Unions assert that Samsung has failed to exhaust its administrative remedies. *See* 28 U.S.C. § 2637(d) (1988) ("the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies"); *Ceramica Regiomontana, S.A. v. United States,* 14 CIT 712, 714, 1990 WL 160258 (1990) (stating general rule that party aggrieved by agency action must exhaust administrative remedies). In exceptional cases, a reviewing court may consider questions of law not addressed by the agency "where injustice might otherwise result." *Hormel v. Helvering,* 312 U.S. 552, 557, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941). The reviewing court may exercise its discretion in deciding whether to require exhaustion. *Kokusai Elec. Co. v. United States,* 10 CIT 166, 171–72, 632 F.Supp. 23, 28 (1986) (quoting 4 Kenneth Culp Davis, *Administrative Law Treatise* § 26:7, at 444 (2d ed. 1983)).

Samsung maintains that it falls under three exceptions to the exhaustion requirement: (1) the new issue is purely legal; (2) it would have been futile to have raised the argument at the agency level; (3) there has been an intervening judicial interpretation that would change the agency result. *See Budd Co. v. United States,* 15 CIT 446, 452 n.

---

7. For the reasons articulated in note 5, *supra,* this issue is not open for reconsideration.

**434**

2, 773 F.Supp. 1549, 1555 n. 2 (1991) (listing cases).

■ A claim is not "purely legal" where a remand would require Commerce to perform recalculations, *id.* at 452, 773 F.Supp. at 1555, and likely to consider other evidence in the record or even reopen the record.[8] Therefore, the first exception does not apply.

■ Samsung is correct that this court may deem it futile to raise an argument at the administrative level where ITA's past precedent reveals a consistent position on the issue. *Koyo Seiko,* 16 CIT at 544, 796 F.Supp. at 1531. Nevertheless, an administrative agency

> is obliged to deal with a large number of like cases. Repetition of the objection in them might lead to a change of policy, or, if it did not, the [agency] would at least be put on notice of the accumulating risk of wholesale reversals being incurred by its persistence.

*United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952) (footnote omitted). After objecting to ITA's treatment of bad debt expenses in the first administrative review, Samsung obtained a remand on the issue in *Daewoo I,* 13 CIT at 257–60, 712 F.Supp. at 938–40. Objecting to ITA's action in the second administrative review at least would have put ITA "on notice of the accumulating risk of ... reversals" in these multi-issue serial reviews. *L.A. Tucker,* 344 U.S. at 37, 73 S.Ct. at 69. In the interests of fairness to the agency, the court finds that the futility exception should not be applied.

■ The "intervening judicial decision" exception should not apply for similar reasons. Samsung relies on this court's review of the first administrative determination as the intervening judicial decision. *See Daewoo I,* 13 CIT at 257–60, 712 F.Supp. at 938–40. Samsung, however, does not explain why it objected to ITA's treatment of bad debt expenses in the first review, eventually pursuing the issue before this court, but made no objection during the second review proceedings. Samsung's inconsistent behavior does not convince this court that waiver of

the exhaustion requirement is justified. Therefore, the court will not consider Samsung's argument as to bad debt expenses.

### D. Home Market Warranty Expenses

#### i. In–House Repair Costs

During the period of investigation, Samsung operated an in-house repair service for merchandise sold under warranty. It also incurred expenses by contracting repairs out to unrelated service centers and by purchasing replacement parts. Commerce requested that Samsung categorize the costs of maintaining the repairs division as either fixed or variable. It did not make a similar request with regard to outside service centers. In its preliminary determination, Commerce treated both fixed and variable costs as indirect selling expenses. *See* Def.'s Mem. Partial Opp'n to Def.–Ints.' Mot. J. Agency R., Pub. App., Ex. 2, at 21.

In its objections to the preliminary results, Samsung complained that its variable costs justified treatment as direct selling expenses. 51 Fed.Reg. at 41,377. Commerce accepted this argument in its final determination. *Id.* Samsung now poses an additional argument before this court, requesting a remand for Commerce to include Samsung's fixed costs of in-house repair in the direct selling expense adjustment.

Samsung has once again failed to exhaust its administrative remedies. Because Samsung requests a remand which may require retrieval and analysis of more data, the issue is not purely legal. *See Budd,* 15 CIT at 452 & n. 2, 773 F.Supp. at 1555 & n. 2. The fact that ITA classified a portion of in-house warranty costs as direct selling expenses after Samsung's objection to the preliminary results belies Samsung's argument that further objections would have been futile.

■ Samsung contends that in 1989, three years after the final determination, this court directly addressed the question of whether fixed in-house warranty costs qualify as a directly related selling expense. *See AOC Int'l, Inc. v. United States,* 13 CIT 716, 717–20, 721 F.Supp. 314, 315–18 (1989) (find-

---

**8.** For example, is historical evidence of bad debt losses relevant?

ing that each cost component of directly-related expense need not independently meet "direct relationship" test). Whether or not this is true, the court finds it unfair to allow Samsung to raise this issue at this time. Samsung was aware of the issue at the time of administrative proceedings, as is apparent from its objection that the agency did not treat its variable warranty expenses as direct. In the court's view, Samsung made a tactical decision to contest treatment of variable expenses without addressing the issue of fixed expenses. Under these circumstances, waiver is not appropriate. *Budd,* 15 CIT at 453, 773 F.Supp. at 1555 (finding that plaintiff's tactical decision not to raise issue before agency precluded it from raising issue before court). The court therefore declines to address the issue of in-house warranty costs on the ground that administrative remedies were not exhausted.

### ii. Replacement Parts

■ Commerce denied a direct selling expense adjustment for the cost of replacement parts over Samsung's objection, because "Samsung had the information to tie the expense to repairs but did not incorporate that information in its claimed adjustment." 51 Fed.Reg. at 41,377. Samsung instead computed an allocation ratio equalling the number of repairs for each model divided by the total number of repairs, allowing Samsung to allocate total parts costs to each model. Samsung maintains that providing parts information on a sale-by-sale basis would necessitate the unduly burdensome task of reviewing hundreds of thousands of individual repair slips.[9] It contends that an allocation ratio was more appropriate and in accordance with its accounting procedures.

Commerce now requests a remand on this issue to reconsider its classification of parts cost as an indirect selling expense. According to Zenith and the Unions, however, Samsung's allocation methodology provided no rational tie between parts costs and individual models repaired or sold. In *Zenith,* the Federal Circuit upheld an allocation method-

ology for warranty parts expenses that divided the total parts charges for a model in a single year by the number of units of that model sold during the year. 988 F.2d at 1579, 1584. Samsung's methodology differs only in that it used a ratio to determine total parts charges per model. Given the difficulties in determining a more exact amount and Commerce's acknowledgement of those difficulties, this court grants Commerce's request for a remand on this issue.

### E. Forwarding Charges

■ Samsung reported its expenses in hiring temporary workers to load color televisions from warehouses onto trucks as home market forwarding charges. Zenith and the Unions protested that these charges resembled fixed labor costs and did not warrant an adjustment for direct selling expenses. In its final determination, Commerce agreed with Zenith and the Unions, stating that "these 'temporary' workers receive wages and other benefits which are more like those received by salaried, rather than temporary employees." 51 Fed.Reg. at 41,367.

Zenith and the Unions continue to assert that Samsung must demonstrate the variable nature of these labor costs for them to qualify as a direct selling expense. Samsung counters that *AOC* abolished the distinction between fixed and variable expenses. Commerce, in an effort to resolve this issue and create a consistent administrative practice, has requested a remand.

■ This court does not interpret *AOC* as prohibiting reliance on the fixed/variable distinction for all purposes. *AOC* primarily holds that once ITA has found a direct selling expense adjustment to be warranted, it cannot disallow separate components of that expense on the ground that these components are fixed costs. *See* 13 CIT at 719, 721 F.Supp. at 317–18. *AOC* also disapproved of automatically treating fixed costs, such as in-house labor costs for warranty repairs, as indirect if other factors demonstrated a di-

---

**9.** In making its computerized accounting records, Samsung entered the model number for each repair *separately* from the parts costs information. The computerized accounts thus did not

allow Samsung to match parts and model data, because the same part can be used to repair more than one model. Def.–Ints.' Mot. J. Agency R., Conf.App. A, Tab 5, at 18 n. 9.

rect relationship to the terms of sale. *See id.* at 718, 721 F.Supp. at 316–17.

Samsung's claim that its temporary workers were hired as needed to transport the color televisions under review is an example of one factor demonstrating a direct relationship to sales. This issue is therefore remanded to ITA for reconsideration of its classification of home market forwarding charges as indirect selling expenses.[10]

## VII. Clerical Errors in ITA's Computer Program

■ Samsung alleges six errors in ITA's computer program that was used to calculate the dumping margin. ITA, Zenith and the Unions agree that errors were committed in calculating the warranty adjustment on PP sales, sales promotion expense, and adjustment for physical differences in merchandise. Therefore, remand is ordered with respect to these three errors.[11]

ITA also requests a remand for the recalculation of home market advertising adjustment figures. Despite the argument of Zenith and the Unions that the adjustment amounts represent reasonable estimates only, this court refuses to regard these clear clerical errors as negligible and not worthy of correction. Remand is granted.

Samsung further alleges a discrepancy in the amount of home market inland freight computed by ITA and the amount claimed. ITA requests a remand because it is unable to determine whether an error was made. Zenith and the Unions quote a passage from the final determination stating that ITA deducted a portion of the claimed amount for April 1984. 51 Fed.Reg. at 41,367. The program uses a date code that corresponds to May 1, 1984. Def.–Ints.' Conf.App. A, Tab 12; Def.'s Pub.App., Ex. 4. It is unclear

whether the values for inland freight are literal monetary figures or codes referring to a separate table of figures. *See* Def.–Ints.' Conf.App. A, Tab 12. The numbers do not correspond to the figures reported in Samsung's questionnaire response. *See id.,* Tab 2, at App. B–2. Therefore, this court grants the requested remand on this issue.

Samsung's claim that ITA used the incorrect date to calculate incentive discounts is withdrawn. ITA requests a remand to consider Samsung's allegation that ITA used allocation rates determined by dividing the incentive discounts in April–June 1984 by sales revenue for the entire review period. It is not clear from the record whether Samsung submitted the correct allocation rates or whether Commerce used these rates. Therefore, remand is granted on this question.[12]

### *Conclusion*

This case is hereby remanded to Commerce with instructions to (1) recalculate the VAT adjustment according to its new methodology, (2) apply *PQ Corp.* in determining whether certain sales qualify as PP or ESP transactions, and (3) adjust ESP for commissions and indirect selling expenses. As to Samsung's claimed circumstance of sale adjustments to FMV, Commerce is directed to re-classify (1) SYPM credit rebates and (2) volume rebates as direct selling expenses, and to reconsider the classification of (3) replacement parts and (4) forwarding charges. The clerical errors in ITA's computer program should also be corrected on remand. In all other respects, ITA's determination in the second administrative review of color televisions from Korea is sustained. Commerce is directed to submit its remand results within 90 days. Any comments

---

10. Perhaps Commerce will use this opportunity to articulate a coherent policy on direct selling expenses, which addresses the concerns noted by the court in *Daewoo I, AOC* and this opinion, among others; and while treatment may vary depending on the expense type, the reason for the variance might be explained.

11. Zenith and the Unions point out what they perceive to be an additional error in Samsung's favor in the calculation of warranty adjustment

rates. As Zenith and the Unions did not raise this issue until the filing of their response brief to Samsung's 56.2 motion, this claim is untimely and need not be addressed by ITA on remand.

12. As Samsung has withdrawn its claim regarding imputed inventory carrying costs, this court will not address it except to state that the issue was previously decided in *Daewoo I,* 13 CIT at 274–75, 712 F.Supp. at 950–51.

thereon are due within twenty days thereafter.