ARAMIDE MAATSCHAPPIJ V.o.F. and
Akzo Fibers Inc., Plaintiffs,

v.

UNITED STATES, Defendant,

and

E.I. Du Pont de Nemours & Company,
Inc., Defendant–Intervenor.

Slip Op. No. 95–147.
Court No. 94–07–00424.

United States Court of
International Trade.

Aug. 18, 1995.

Adduci, Mastriani, Schaumberg, Meeks & Schill, L.L.P. (Tom M. Schaumberg, Barbara A. Murphy and Gregory C. Anthes), for plaintiffs.

Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Harold D. Lester, Jr.), Boguslawa B. Thoemmes, Attorney Advisor, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

Wilmer, Cutler & Pickering (John D. Greenwald and Ronald I. Meltzer) for defendant-intervenor.

### *OPINION*

RESTANI, Judge:

This matter is before the court on a motion for judgment upon the agency record pursuant to USCIT Rule 56.2. The motion has been brought by Aramid Products V.o.F. (formerly Aramide Maatschappij V.o.F.) and Akzo Nobel Fibers Inc. (formerly Akzo Fibers Inc.) (collectively "Aramide"), challenging the determination of the International Trade Administration of the United States Department of Commerce ("Commerce") in *Aramid Fiber Formed of Poly–Phenylene [sic] Terephthalamide from the Netherlands,* 59 Fed.Reg. 23,684 (Dep't Comm.1994) (final determ. of LTFV sales) ("*Final Det.*"), and in *Aramid Fiber Formed of Poly–Phenylene [sic] Terephthalamide from the Netherlands,* 59 Fed.Reg. 32,678 (Dep't Comm.1994) (antidumping duty order and amended final determ. of LTFV sales) ("*Amended Final Det.*").

### *Background*

On July 2, 1993, E.I. Du Pont de Nemours & Company, Inc. ("petitioner" or "Du Pont") filed a petition with Commerce, alleging that an industry in the United States was materially injured or threatened with material injury by reason of less than fair value ("LTFV") imports of poly para-phenylene terephthalamide aramid fiber ("PPD–T aramid fiber") from the Netherlands. Du Pont is the sole U.S. producer of PPD–T aramid fiber, which is a high-performance synthetic fiber with special characteristics that include high strength, resistance to deformation from stretch, high thermal stability, fire resistance, and chemical resistance. *See Aramid*

*Fiber Formed of Poly Para–Phenylene Terephthalamide from the Netherlands,* USITC Pub. 2783, Inv. No. 731–TA–652, at I–6 (June 1994) (affirmative final determ.). PPD–T aramid fiber is available in a variety of forms, such as filament yarn, staple fiber, pulp, floc, chopped fiber, and nonwovens. *Final Det.* at 23,685.

Commerce determined that the product under investigation consisted of a "single class or kind of merchandise":

> PPD–T aramid in the form of filament yarn (including single and corded), staple fiber, pulp (wet or dry), spun-laced and spun-based nonwovens, chopped fiber and floc. Tire cord fabric is excluded from the class or kind of merchandise under investigation.

*Id.* For price comparison purposes, Commerce found three "such or similar" product categories: yarn, staple fiber and pulp. *Id.; see* 19 U.S.C. § 1677(16) (1988) (definition of such or similar merchandise) (current version at 19 U.S.C.A. § 1677(16) (West Supp.1995)).

Subsequent to its antidumping duty investigation for the period January 1 through June 30, 1993, Commerce issued its final determination on May 6, 1994, concluding that PPD–T aramid fiber imports from the Netherlands were being, or were likely to be, sold in the United States at LTFV. *Final Det.* at 23,684. Aramide, the sole respondent involved in the investigation, challenges certain portions of Commerce's determination. Defendant and petitioner oppose Aramide's motion.

### *Standard of Review*

In reviewing final determinations in antidumping duty investigations, the court will hold unlawful those determinations by Commerce found to be unsupported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1988) (current version at 19 U.S.C.A. § 1516a(b)(1)(B)(i) (West Supp. 1995)).

### *Discussion*

I. Profit Calculation for Constructed Value

For the three "such or similar categories" identified in the final determination, Com-

merce found that no viable home market sales existed for purposes of price comparisons. *Final Det.* at 23,685. Thus, for certain products within a such or similar category, Commerce based foreign market value ("FMV") upon third-country sales of the subject merchandise: Germany for yarn and staple fiber sales, and Japan for pulp sales.[1] *Id.; see also* 19 U.S.C. § 1677b(a)(1)(B) (1988) (FMV may be based upon third-country sales) (current version at 19 U.S.C.A. § 1677b(a)(1)(B)(ii), (C) (West Supp.1995)). Where sales of certain products were not made above the cost of production ("COP"), Commerce based FMV on constructed value (or "CV"). Third country data was also used for constructed value. *See, e.g., Certain Valves and Connections, of Brass, for Use in Fire Protection Systems from Italy,* 55 Fed. Reg. 50,342, 50,343 (Dep't Comm.1990) (prelim. results of admin. review) (indicating that Commerce bases selling expenses and profit upon third-country data where no home market data is usable).

In making its constructed value calculation, Commerce is required to include

> an amount for ... profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise under consideration which are made by producers in the country of exportation, in the usual commercial quantities and in the ordinary course of trade.

19 U.S.C. § 1677b(e)(1)(B) (1988) (current version at 19 U.S.C.A. § 1677b(e)(2) (West Supp.1995)). The profit amount included in constructed value may not be less than the statutory minimum of eight percent of the sum of cost of materials and general expenses. *Id.* § 1677b(e)(1)(B)(ii). Here, Commerce calculated Aramide's profit on a market-specific basis, using "one average profit for pulp sold in Japan and another for yarn and staple sold in Germany." *Final Det.* at 23,690. As a result, actual profit was used for Germany, and the statutory minimum of eight percent was used for Japan. *Id.* at 23,686.

Aramide contends that Commerce's calculation of profit on a market-specific basis is contrary to the statute, in that the statute requires the profit calculation to be based upon the "same general class or kind" of merchandise. Aramide asserts that a single weighted-average profit percentage derived from all of Aramide's third-country sales should have been used.

The court agrees that, in general, the statute permits an overall profit estimation based upon the "class or kind" of merchandise. 19 U.S.C. § 1677b(e)(1)(B). The issue is whether a single weighted-average profit percentage is required in all cases. As is now axiomatic, considerable weight is to be accorded Commerce's construction of a statutory scheme it is entrusted to administer. *See PPG Indus., Inc. v. United States,* 928 F.2d 1568, 1571–72 (Fed.Cir.1991) ("[C]ourts must defer to an agency's interpretation of the statute an agency has been charged with administering provided its interpretation is a reasonable one."). Accordingly, the court must determine whether Commerce's market-specific approach is a reasonable and permissible application of the statute.

First, as indicated, Commerce is required to include in constructed value "an amount for ... profit equal to that *usually* reflected in sales of merchandise of the same *general* class or kind." 19 U.S.C. § 1677b(e)(1)(B) (emphasis added). Here, constructed value was based upon data for the subject merchandise in more than one third-country market. In this particular circumstance, Commerce reasoned that

> it is appropriate to calculate all selling expenses and profit specific to the market in which the products in question were sold rather than average profit across two or more countries.

*Final Det.* at 23,690. The statute employs broad language and is drafted in terms which permit some adjustment to achieve accuracy in anomalous cases. In this atypical situation of multiple markets, Commerce determined that an accurate profit calculation would be derived by using market-specific

---

1. Pursuant to 19 C.F.R. § 353.49(b) (1993), Commerce found Japan to be the appropriate third-market country for pulp sales, as it was Akzo's largest export market for such sales. *See* Def.'s Mem. in Opp'n to Pls.' Mot.J. Upon Agency R. at 22.

data as opposed to data which obscured the link to sales in a particular market. Thus, two separate profit percentages were generated for the class or kind of merchandise.[2]

Second, assuming, *arguendo*, that a single profit percentage is required, there are a number of ways to derive a single profit figure for a class or kind of merchandise. Nothing in the statute requires a weighted-average profit figure derived from individual sales. In any case, the statute refers to a usual amount for the general class of merchandise. It does not say a single percentage for the class, and it assuredly does not say "a single weighted-average percentage." Thus, plaintiffs' challenge fails as to the profit calculation.

■ Aramide also contests Commerce's exclusion in the final determination of sales of second-quality merchandise and sales subject to German value-added tax ("VAT") from the profit calculation included in constructed value. Commerce, however, excluded these sales from the FMV calculation in the preliminary determination, reasoning that Aramide had not explained why U.S. sales of first-quality merchandise were appropriate for comparison to second-quality merchandise. *Aramid Fiber Formed of Poly–Phenylene [sic] Terephthalamide from the Netherlands*, 58 Fed.Reg. 65,699, 65,700 (Dep't Comm.1993) (prelim. determ.). Aramide raised no challenge to Commerce's calculation in this regard until after issuance of the final determination. Further, defendant indicates that the programming language providing for exclusion of these sales in the preliminary determination, and later disclosed to Aramide, did not change from the final determination. Def.'s Mem. in Opp'n to Pls.' Mot.J. Upon Agency R. at 30–31. As Aramide was on notice of Commerce's intended computation, the court concludes that Aramide was required to and failed to exhaust its administrative remedies. *See* 28 U.S.C. § 2637(d) (1988) ("The [CIT] shall, where appropriate, require the exhaustion of administrative remedies."); *see, e.g., Encon Indus., Inc. v. United States*, 1994 WL 520917, Slip Op. 94–145, at 3–4 (Sept. 19, 1994) (dismissing challenge to Commerce's "all others" rate calculation where plaintiff failed to submit argument to Commerce in underlying administrative proceedings).

■ Aramide's claim that it raises a "purely legal" challenge to Commerce's final determination, thus fitting into one of the exceptions to the exhaustion requirement, is without merit.[3] Assuming, *arguendo*, that a purely legal argument may be excepted from normal exhaustion rules,[4] Commerce likely must consider, on remand, other evidence in the record and perform recalculations. Thus, in a strict sense, Aramide's claim is not "purely legal." *See Budd Co.*, 15 CIT at 452, 773 F.Supp. at 1555; *Independent Radionic Workers v. United States*, 862 F.Supp. 422, 434 (Ct. Int'l Trade 1994). Accordingly, the

---

**2.** In further support of its position, defendant cites *Cellular Mobile Telephones and Subassemblies from Japan*, 54 Fed.Reg. 48,011, 48,012 (Dep't Comm.1989) (final results), as advancing the proposition that Commerce may calculate profit on a product-specific basis "when such data are more accurate or otherwise more appropriate." This methodology was used in the preliminary determination in that proceeding, however, because of deficient product-specific data for general expenses, Commerce relied upon respondent's more expansive data as to the same general class or kind of merchandise for the final determination. Defendant does not allege that this particular methodology is pertinent to this case. Thus, the court does not address whether a profit calculation on the basis of product-specific data is a permissible construction of the statute.

**3.** The cases where the court generally has not required exhaustion of administrative remedies

are (1) where plaintiff raised a new argument that was purely legal and required no further agency involvement, (2) where plaintiff did not have timely access to the confidential record, (3) where a judicial interpretation intervened since the remand proceeding, changing the agency result, and (4) where it would have been futile for plaintiff to have raised its argument at the administrative level. *See Budd Co. v. United States*, 15 CIT 446, 452 n. 2, 773 F.Supp. 1549, 1555 n. 2 (1991) (listing cases).

**4.** The "purely legal" exception is a weak one in any case. Commerce should consider even purely legal arguments in the first instance. *See Holmes Prods. Corp. v. United States*, 16 CIT 1101, 1103, 1992 WL 394223 (1992) (finding plaintiff's legal argument waived for failure to raise it before agency). Absent other factors indicating an exception should be made, the "purely legal" argument should fail.

court will not consider plaintiffs' substantive challenge on this point and Commerce's exclusion from FMV of second-quality merchandise sales and sales subject to German VAT, is sustained.

## II. Corporate Consolidation Issues

Antidumping questionnaires issued to Aramide in the underlying administrative proceeding requested data concerning, *inter alia*, the hierarchical and organizational structure of Aramide and its related companies, including any percentages of ownership held by Aramide or other related party. To supplement its questionnaire responses, Aramide submitted comments notifying Commerce of a planned change of the equity interests in Aramide. Aramide is a joint venture between Akzo Fibers Aramide B.V., a wholly-owned subsidiary of Akzo N.V. (collectively "Akzo N.V."), and the Dutch government, each with a 50% ownership interest. Aramide informed Commerce that (1) Akzo N.V. planned to increase its 50% equity interest in Aramide to 95%, pending approval of the Dutch government, (2) this restructuring would result in the consolidation of Aramide's balance sheet into Akzo N.V.'s balance sheet for the 1993 fiscal year, and (3) both the balance sheets and profit and loss statements of Aramide and Akzo N.V. would be consolidated for the 1993 fiscal year. *See* Pls.' Conf.App. to Mot.J. Upon Agency R., Tab C.R. 38, at 1–3. As a result, Aramide submitted certain consolidated data to Commerce, such as cost and interest expense information. The new restructuring agreement was signed in 1994 with consolidation of Aramide's balance sheet with Akzo N.V. effective December 31, 1993. *Final Det.* at 23,688.

■ In the final determination, Commerce rejected Aramide's submission of consolidated data for COP and constructed value calculations, on the basis that the corporate restructuring occurred subsequent to the period of investigation. *Id.* Under U.S. and Dutch generally accepted accounting principles, "consolidation is required when one company holds more than a 50 percent equity interest in another company." *Id.* As Akzo N.V. and the Dutch government had equal control over Aramide until the consolidation agreement was signed in 1994, Commerce determined that consolidated treatment was not warranted for the period of investigation. *Id.* The court finds no error in Commerce's conclusion.

### A. Aramide's submission of Akzo N.V.'s 1993 Annual Report

■ In an attempt to "corroborate" its submitted data on the planned consolidation of Aramide and Akzo N.V., Aramide submitted Akzo N.V.'s 1993 Annual Report ("Annual Report") in its March 28, 1994 Pre–Hearing Brief presented in the underlying administrative proceeding. According to Aramide, the relevant excerpts cited from the Annual Report only corroborated Aramide's comments of the planned corporate restructuring. The Annual Report also contained, however, an independently-audited balance sheet, into which Aramide's balance sheet was consolidated. Pursuant to 19 C.F.R. § 353.31(a)(1)(i) (1994),[5] Commerce rejected Aramide's submission of this information as untimely and as "unsolicited new factual information."

Aramide admits the data was submitted untimely, but relying upon *Bowe–Passat v. United States,* 1993 WL 179269 Slip Op. 93–68, at 11 (May 7, 1993), alleges that the data did not "substitute or modify figures previously timely submitted for Commerce's calculations." Aramide's claim is without merit. Although Aramide informed Commerce of the planned restructuring, the agreement was not finalized until 1994. Thus, Aramide's attempt to provide Commerce with definitive data of the effects of the restructuring plan, constitutes new information that likely would require further verification. As indicated, Commerce properly determined that Aramide's financial statements would

---

**5.** Under 19 C.F.R. § 353.31(a)(1)(i), "submissions of factual information for [Commerce's] consideration shall be submitted not later than . . . [f]or [Commerce's] final determination, seven days before the scheduled date on which the verification is to commence." *Id.* Verification was commenced on February 21, 1994. Thus, the last day for submission of new information was February 14, 1994.

not be considered on a consolidated basis, and although it also properly rejected the new data, the new data, if accepted, should not have altered the outcome.

### B. *Commerce's imputation of Aramide's interest expense for CV purposes*

During the period of investigation, Commerce found that Aramide received a substantial amount of below-market rate loans from its parent company, Akzo N.V. Pursuant to 19 U.S.C. § 1677b(e)(2),[6] Commerce imputed an interest expense to the loans on the basis of best information available ("BIA"). *Final Det.* at 23,689.

Aramide does not specifically challenge the BIA used by Commerce to impute interest expenses. Rather, Aramide asserts that on a consolidated basis with Akzo N.V. for the 1993 fiscal year, no interest expenses were incurred because the loans were converted into equity. As Commerce properly rejected Aramide's view of itself as a consolidated corporation, as applying to the period of investigation, Aramide's argument is without merit. The court sustains Commerce's imputation of Aramide's interest expenses for the below-market rate loans from Akzo N.V.

### C. *Inclusion of prior period expense in COP and CV*

■ In the final determination, Commerce included certain expenses, incurred and fully paid for by Akzo N.V. prior to the period of investigation, in Aramide's general and administrative expenses ("G & A") calculation for COP and constructed value purposes. The prior period expenses were apparently incurred by Akzo N.V. on behalf of Aramide. *See* Pls.' Conf.App. to Mot.J. Upon Agency R., Tab C.R. 70, at 3. Aramide amortized a certain percentage of this expense "as a separate line item in its 1993 six-month financial

statements, and as part of selling expenses in its 1992 audited annual financial statements." *Id.* This was consistent with Aramide's practice of allocating a certain percentage of the prior period expense in its financial statements. *See id.,* Tab C.R. 15, at 28. Thus, Commerce determined that "this expense relates to the general production activity of [Aramide] ... and represents an actual cost recorded on [Aramide's] books during the [period of investigation.]" *Final Det.* at 23,-689.

Aramide asserts the prior period expense is actually an "intracompany transaction" that does not reflect the cost incurred during the period of investigation. The court disagrees. The allocation of the prior period expense was pursuant to an agreement entered into between Akzo N.V. and Aramide's parent company. *See* Pls.' Conf.App. to Mot.J. Upon Agency R., Tab C.R. 15, at 28. Thus, the companies chose to assess this expense to Aramide in an allocation scheme that represented an actual charge upon Aramide's financial operations. Therefore, the court finds no error with Commerce's conclusion in this regard. Further, Aramide's argument that the consolidation of Akzo N.V. and Aramide converted this prior period expense into equity, and consequently eliminated the expense, is without merit. *See* discussion of imputed interest expenses, *supra,* at 12–13. Accordingly, the court sustains Commerce inclusion of this prior period expense in Aramide's G & A calculation for purposes of COP and constructed value.

### III. Inclusion of Certain G & A Expenses in Aramide's U.S. Indirect Selling Expenses

■ Commerce based Aramide's United States price ("USP") upon exporter's sales price[7] ("ESP"), thus ESP was reduced by

---

**6.** That provision, in pertinent part, provides:

> [A] transaction directly or indirectly between [related parties] ... may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales in the market under consideration of merchandise under consideration. If a transaction is disregarded ..., then the determination of the amount required to be con-

sidered shall be based on the best evidence available as ... if the transaction had occurred between [unrelated parties].

19 U.S.C. § 1677b(e)(2) (current version at 19 U.S.C.A. § 1677b(f)(2) (West Supp.1995)).

**7.** ESP is defined as "the price at which merchandise is sold or agreed to be sold in the United States, before or after the time of importation, by or for the account of the exporter." 19 U.S.C.

expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise.

19 U.S.C. § 1677a(e)(2) (1988) (current version at 19 U.S.C.A. § 1677a(d) (West Supp. 1995)). For purposes of calculating indirect selling expenses, Commerce generally will include G & A expenses incurred by the United States selling arm of a foreign producer. *See Brass Sheet and Strip from the Federal Republic of Germany,* 52 Fed.Reg. 822, 824 (Dep't Comm.1987) (final determ.). In this case, Commerce determined that it was appropriate to include in Aramide's indirect selling expenses, certain G & A expenses incurred by Akzo America, Inc. ("Akzo America") on behalf of Aramide's U.S. selling arm, Akzo Fibers, Inc. ("Akzo Fibers"). Akzo America is a parent company providing administrative, accounting and finance services to all of Aramide's North American subsidiaries. *Final Det.* at 23,687.

In its questionnaire response, Aramide indicated that Akzo Fibers recorded certain "intercompany charges" from its parent, Akzo America. In making its indirect expense allocation, however, Aramide included only those "intercompany charges" that were "properly classifiable as selling expenses (*i.e.,* product liability premiums and corporate advertising)." Pls.' Conf.App. to Mot.J. Upon Agency R., Tab C.R. 28, at 68. Aramide reasoned that the remaining intercompany charges, or "non-MIAC" charges, did not constitute direct or indirect selling expenses as they were "of a corporate-wide administrative nature (*e.g.,* legal, audit [support,] and personnel)." *Id.* Consequently, Aramide reclassified these charges as "intercompany transfers." *Id.* Nonetheless, in the final determination, Commerce disagreed that the "non-MIAC" charges were "not associated with the selling function of Akzo Fibers."

*See Final Det.* at 23,687. Thus, Commerce included a proportionate share of these expenses in the calculation of Aramide's U.S. indirect selling expenses.

Aramide contends that Commerce erred in its calculation, as the "non-MIAC" charges were not attributable to sales of the subject merchandise. In general, Commerce defines indirect selling expenses as "those [selling expenses] which cannot be tied to particular sales, such as salaries paid to sales personnel and inventory carrying costs." *See* Int'l Trade Admin., U.S. Dep't of Comm., *Antidumping Manual: Import Administration* ch. 7, at 11 (July 1993) (hereinafter *"Antidumping Manual"*). Here, Akzo Fibers received various corporate-level administrative support services that at a minimum, according to Commerce, were indirectly related to Akzo Fibers' selling functions. *Final Det.* at 23,687. Further, Commerce did not find any evidence indicating that Akzo America provided services to Akzo N.V., its parent company in the Netherlands, "other than to facilitate the activities of the subsidiaries in the United States." *Id.* The court finds Commerce's conclusion supported by substantial evidence.

## IV. Correction of Ministerial Error

After issuance of the final determination, and on the last day for comment, petitioner notified Commerce on May 10, 1994, of certain ministerial errors contained in the margin calculations for Aramide, and requested a two-day extension for completion of its ministerial error analysis.[8] On May 11, 1994, Aramide objected to petitioner's request, arguing that petitioner failed to show adequate cause for the extension. On that same date, petitioner submitted its comments regarding ministerial error in the final determination. Commerce denied petitioner's request for an

---

§ 1677a(c) (1988) (current version at 19 U.S.C.A. § 1677a(b) (West Supp.1995)).

**8.** Pursuant to 19 C.F.R. 353.28(b) (1994), comments for correction of ministerial errors,

> must be filed within five business days after the date of disclosure unless [Commerce] extends the time limit based upon a written request for extension that is filed within five business days

after the date of disclosure and showing cause for such extension.

*Id.* Petitioner's letter indicated that a two-day extension of time was necessary to ascertain the ministerial error because of the lack of a complete printout of Commerce's margin analysis, and the fact that Commerce's primary analyst was not available during the comment period. Def.–Int.'s Mem. in Opp'n to Pls.' Mot.J. Upon Agency R., App., Tab P.R. 165, at 2.

extension for failure to show adequate cause on June 15, 1994, and rejected petitioner's submissions as untimely.

On June 17, 1994, petitioner again requested that Commerce reconsider the denial of petitioner's request for an extension of time to file comments, and reconsider the refusal to correct ministerial errors in the final determination. Aramide again opposed petitioner's letter. Nonetheless, on June 21, 1994, Commerce notified Aramide that correction of a ministerial error regarding currency conversions in the constructed value calculation would be made, despite the untimeliness of petitioner's comments. Pls.' Pub.App. to Mot.J. Upon Agency R., Tab P.R. 175, at 1. Correction of this error increased the final margin calculation for Aramide. *See Amended Final Det.* at 32,678.

■ Under the statute, Commerce may correct "ministerial errors" resulting from

> errors in addition, subtraction, or other arithmetic function, clerical errors resulting from inaccurate copying, duplication, or the like, and any other type of unintentional error which the administering authority considers ministerial.

19 U.S.C. § 1673d(e) (1988); *see* 19 C.F.R. § 353.28(d) (1994). In this case, Commerce failed to convert Aramide's direct selling expenses from German marks and Japanese yen into Dutch guilders before deduction from the Dutch-guilder denominated constructed value calculation. This is clearly a clerical or ministerial error, not one resulting from a judgment call.

Aramide contends that Commerce failed to follow its regulations by considering petitioner's untimely submissions for purposes of making the correction. Aramide further points out that the error existed at the time of issuance of the preliminary determination on December 9, 1993, and petitioner did not exhaust administrative remedies on this point. Thus, according to Aramide, no clerical error should have been corrected by Commerce and an antidumping duty order should have been issued with the margin

contained in the final determination. The court disagrees.

The court does not find that Commerce failed to follow its regulations. As indicated, Commerce denied petitioner's request for extension of time to file comments on the basis that petitioner failed to show adequate cause.[9] The result was Commerce's removal of petitioner's untimely submissions from the record. Pls.' Pub.App. to Mot.J. Upon Agency R., Tab P.R. 171, at 1. Although petitioner submitted another objection to Commerce's denial, there is no indication in the record that Commerce permitted petitioner to resubmit its comments.

■ Commerce also did not err in amending the determination pursuant to its *sua sponte* authority. First, Aramide's speculation that Commerce succumbed to correction of the ministerial error because of political pressure by petitioner is only speculation. No evidence supports this theory. Second, any requirement of exhaustion of administrative remedies does not apply to the administrator. Third, the court has long recognized that "fair and accurate determinations are fundamental to the proper administration of our dumping laws." *See, e.g., Koyo Seiko Co. v. United States,* 14 CIT 680, 682, 746 F.Supp. 1108, 1110 (1990). As a result, except in unusual situations not present here, the court has "uniformly authorized the correction of any clerical errors which would affect the accuracy of a determination." *Id.; see Federal–Mogul Corp. v. United States,* 872 F.Supp. 1011, 1014 (Ct. Int'l Trade 1994) (listing cases). *But see Hyster Co. v. United States,* 858 F.Supp. 202, 206 (Ct. Int'l Trade 1994) (refusing to permit correction of errors, as plaintiffs' allegations presented new bases of error and were untimely in "already lengthy proceeding"). The court finds that Commerce may, with or without a party's request, correct errors that it reasonably regards as ministerial in final determinations. *See CEMEX, S.A. v. United States,* 1995 WL 251561 Slip Op. 95–72, at 15 (Apr. 24, 1995); *see also Bookman v. United States,* 197 Ct. Cl. 108, 453 F.2d 1263, 1265–66 (1972) (noting that as general rule, agency has some power

---

**9.** The court does not address whether it was an abuse of discretion to deny the extension. Given

the circumstances, however, it probably would have been appropriate to grant the extension.

to correct its own errors, so long as that decision is not arbitrary, capricious or unsupported by substantial evidence). As indicated, these errors were well within the category of clerical or ministerial error. Thus, Commerce's correction of currency conversions in Aramide's constructed value calculation is sustained.

## CONCLUSION

Finding no error of law and finding Commerce's determination supported by substantial evidence in all respects, the court sustains the determination.

## JUDGMENT