# United States Court of Appeals for the Federal Circuit

2010-1023

AMERICAN SIGNATURE, INC.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee,

and

AMERICAN FURNITURE MANUFACTURERS COMMITTEE FOR
LEGAL TRADE and VAUGHAN-BASSETT FURNITURE COMPANY, INC.,

Defendants-Appellees.

R. Will Planert, Troutman Sanders LLP, of Washington, DC, argued for plaintiff-appellant.  With him on the brief were Jeffrey S. Grimson, Donald B. Cameron, Julie C. Mendoza, Brady W. Mills and Mary S. Hodgins.

Stephen C. Tosini, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee United States.  With him on the brief were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director.  Of counsel on the brief was Edward N. Maurer, Deputy Assistant Chief Counsel, International Trade Litigation, United States Customs and Border Protection, of New York, New York.

Joseph W. Dorn,  King & Spalding LLP, of Washington, DC, argued for defendants-appellees American Furniture Manufacturers Committee for Legal Trade, et al.  With him on the brief were Ashley C. Parrish, J. Michael Taylor, Eric M. Wachter and Steven R. Keener.

Appealed from:  United States Court of  International Trade

Judge Leo M. Gordon

# United States Court of Appeals for the Federal Circuit

2010-1023

AMERICAN SIGNATURE, INC.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee,

and

AMERICAN FURNITURE MANUFACTURERS COMMITTEE FOR
LEGAL TRADE and VAUGHAN-BASSETT FURNITURE COMPANY, INC.,

Defendants-Appellees.

Appeal from the United States Court of International Trade in case no.
09-CV-0400, Judge Leo M. Gordon.

_____

DECIDED: March 10, 2010

_____

Before RADER, CLEVENGER, and DYK, Circuit Judges.

DYK, Circuit Judge.

American Signature, Inc. ("ASI") appeals from a decision of the Court of International Trade denying ASI's motion for a preliminary injunction. See Am. Signature, Inc. v. United States, No. 09-00400 (Ct. Int'l Trade Oct. 13, 2009) ("ASI I"). Because we conclude that ASI has satisfied the conditions for the issuance of a preliminary injunction, we reverse.

BACKGROUND

The antidumping law imposes special duties upon imports of merchandise sold at less than normal value to the detriment of a domestic industry. 19 U.S.C. § 1673. ASI is an importer of furniture that is subject to a January 4, 2005, antidumping duty order on certain entries of wooden bedroom furniture from China.[1] The second administrative review of this order was initiated on March 7, 2007. Such administrative reviews are designed to revisit the original antidumping duty order in order to determine whether dumping has occurred and, if so, the amount of antidumping duties that are owed, and the amount of future cash deposit rates (in effect, dumping duties imposed on future entries). See generally Ugine & ALZ Belg. v. United States, 551 F.3d 1339, 1341 (Fed. Cir. 2009) ("Ugine II"). ASI imported subject merchandise exported by the Chinese exporter Dare Group during the second period of review, that is, January 1, 2006 – December 31, 2006, and participated as a party to that review. The Department of Commerce ("Commerce") published its final results of that administrative review on August 20, 2008 ("Final Results").[2]

For the purpose of calculating antidumping duties in its administrative reviews, Commerce calculates a dumping margin for each exporter, which is calculated based

---

[1] See Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Wooden Bedroom Furniture From the People's Republic of China, 70 Fed. Reg. 329 (Dep't Commerce Jan. 4, 2005).

[2] See Wooden Bedroom Furniture from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and New Shipper Review, 73 Fed. Reg. 49,162-01 (Aug. 20, 2008) ("Final Results").

on all of the subject merchandise it exports to the United States.[3]  The dumping margin is a dollar figure and is defined as "the amount by which the normal value exceeds the export price . . . of the subject merchandise."  19 U.S.C. § 1677(35)(A); see also § 1675(a)(2)(A) (Commerce shall calculate "the normal value and export price (or constructed export price) of each entry of the subject merchandise" and "the dumping margin for each such entry.").  Overall weighted average dumping margin rates for each exporter (percentage figures) are calculated and published in the Federal Register.[4]  See id. § 1675(a)(1).  Section 1675(a)(2)(C) provides that "[t]he determination under this paragraph shall be the basis for the assessment of countervailing or antidumping duties on entries of merchandise covered by the determination and for deposits of estimated duties."

Using the dumping margins for each exporter's goods, Commerce then calculates importer-specific ad valorem assessment rates for each such importer.  See 19 U.S.C. § 1675(a)(2)(A)(ii); 19 C.F.R. § 351.212(b).[5]  These importer-specific rates

---

[3]    "The term 'subject merchandise' means the class or kind of merchandise that is within the scope of an investigation, a review, a suspension agreement, [or] an order . . . ."  19 U.S.C. § 1677(25).

[4]    "The term 'weighted average dumping margin' is the percentage determined by dividing the aggregate dumping margins determined for a specific exporter or producer by the aggregate export prices and constructed export prices of such exporter or producer."  19 U.S.C § 1677(35)(B).

[5]    Commerce's implementing regulation, 19 C.F.R. § 351.212(b)(1), provides for the calculation of assessment rates.  It provides:

> (b) Assessment of antidumping and countervailing duties as the result of a review—

> (1) Antidumping duties.  If the Secretary has conducted a review of an antidumping order under § 351.213 (administrative review), § 351.214 (new shipper review), or § 351.215 (expedited antidumping review), the

are treated as confidential and are not published in the Federal Register. Normally, after publication of Final Results, Commerce issues liquidation instructions to Customs and Border Protection ("Customs") with respect to the entries of subject merchandise. Liquidation of entries represents the "final computation or ascertainment of the duties . . . accruing on an entry." 19 C.F.R. § 159.1. Liquidation instructions include importer-specific assessment rates. Customs then liquidates the goods at the importer-specific rates determined by Commerce.

Here, after Commerce published the Final Results of its administrative review on August 20, 2008, the American Furniture Manufacturers Committee for Legal Trade and Vaughan-Basset Furniture Company, Inc. (the "domestic producers"), ASI, and other parties filed actions in the Court of International Trade challenging various aspects of the Final Results. While those appeals were pending, Commerce twice sought and received leave of the Court of International Trade to amend the Final Results to correct ministerial errors.[6] There was no dispute among the parties that correction of these errors was appropriate. These corrections eventually led to the issuance of the Second

_____

Secretary normally will calculate an assessment rate for each importer of subject merchandise covered by the review. The Secretary normally will calculate the assessment rate by dividing the dumping margin found on the subject merchandise examined by the entered value of such merchandise for normal customs duty purposes. The Secretary then will instruct the Customs Service to assess antidumping duties by applying the assessment rate to the entered value of the merchandise.

[6]    A ministerial error is defined in 19 C.F.R. § 351.224(f) as "an error in addition, subtraction, or other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like, and any other similar type of unintentional error which the Secretary considers ministerial."

Amended Final Results.[7]  In its Second Amended Final Results, Commerce calculated

and published in the Federal Register overall weighted average dumping margin rates

for each exporter.  See 19 U.S.C. § 1675(a)(1); id. § 1677(35)(B).  The overall exporter

dumping margin ultimately calculated for exporter Dare Group was 39.46 percent.

There is no dispute about this rate.  In connection with the preparation of its final results,

Commerce calculated importer-specific ad valorem assessment rates using the foreign

exporters' dumping margins.  Due to a computer programming error in Commerce's

antidumping margin calculation computer program, the assessment rate pertaining to

ASI was much lower than the rate ASI would have received in the absence of the error.[8]

The calculations reflecting this error were apparently disclosed by Commerce to the

domestic producers after the release of the Second Amended Final Results in

accordance with the regulations discussed below, but the error was not then noted by

---

[7]     See Second Amended Final Results of Antidumping Duty Administrative Review: Wooden Bedroom Furniture from the People's Republic of China, 74 Fed. Reg. 13,417-01 (Mar. 27, 2009) ("Second Amended Final Results").

[8]     The Court of International Trade misunderstood the issue when it stated that "Commerce erred by incorrectly calculating the denominator of Dare Group's dumping margin by multiplying per-unit entered value by quantity twice, instead of only once." Am. Signature, Inc. v. United States, No. 09-00400, slip op. at 2 (Ct. Int'l Trade Oct. 26, 2009) ("ASI II").  In fact, the denominator does not reflect the Dare Group's dumping margin but rather the entered value of the subject merchandise.  The Dare Group's dumping margin had already been calculated and was published in the Federal Register.  All parties agree that there was no error in the dumping margin.  Here, Commerce's SAS margin calculation program, which it uses to calculate importer-specific assessment rates, erroneously multiplied the "entered value" by quantity twice, thereby substantially increasing the amount of the denominator.  When the program calculated the importer-specific assessment rate by dividing the dumping margin found on the subject merchandise examined (the numerator) by the entered value (the denominator), the resulting number was much lower than it should have been, because the denominator was incorrectly inflated.  See 19 U.S.C. § 1675(a)(2)(A); 19 C.F.R. § 351.212(b)(1).

the domestic producers. After Commerce issued the Second Amended Final Results, all parties by mutual agreement, on May 15, 2008, dismissed their pending appeals before the Court of International Trade.[9]

On July 10, 2009, Commerce transmitted liquidation instructions to Customs, which reflected the error in the assessment rate as to ASI for entries during the period covered by the review. On July 31, 2009, the domestic producers requested a copy of the July 10 liquidation instructions. Commerce released the liquidation instructions on August 24, 2009. On August 25, 2009, the domestic producers' counsel alerted Commerce to the existence of the error. Commerce confirmed the existence of the error and then on August 26, 2009, at Commerce's request, the domestic producers filed and served on all parties a written submission, alleging that the liquidation instructions contained errors resulting in a significant error in the assessment rates for ASI and other importers.

Later that day, Commerce contacted Customs and informed Customs that it planned to issue instructions suspending liquidation of the Dare Group's 2006 entries while Commerce decided how to correct the error in the margin calculation program.[10] For the unliquidated entries, Customs said that it could liquidate pursuant to corrected instructions as soon as it received such instructions. However, Customs replied that it had already liquidated the majority of ASI's entries in accordance with the incorrect July 10, 2009, liquidation instructions. Customs also indicated that it would be able to

---

[9]     Am. Signature, Inc. v. United States, No. 08-00316 (Ct. Int'l Trade May 15, 2008) (joint stipulation of dismissal).

[10]     Commerce issued such instructions to suspend liquidation on August 28, 2009.

reliquidate those entries within the ninety-day statutory window specified in 19 U.S.C. § 1501 at the correct rate if it promptly received corrected instructions. The statutory ninety-day window in which Customs could reliquidate entries was set to expire on October 29, 2009. See 19 U.S.C. § 1501 (providing Customs with discretionary authority to reliquidate within ninety days).

Upon review of interested party comments, on September 17, 2009, Commerce issued its final decision regarding the liquidation instructions. This decision took the form of a memorandum to file in the second administrative review. In its memorandum, Commerce noted that

> in order to ensure that the liquidation instructions are consistent with the Final Results, [Commerce] must correct the programming language . . . . Further, the Department notes that none of the parties have argued that the Department did not generate incorrect assessment rates as a result of the programming error . . . . Accordingly . . . [Commerce] has corrected the programming language to comport with the Final Results and is issuing to [Customs] corrected liquidation instructions containing the assessment rates resulting from the corrected margin program.

ASI I, slip op. at 4. Commerce further explained that it "has not determined that the Final Results were in error and, accordingly is not amending the Final Results. Instead the Department is correcting the margin program language in order to ensure that the liquidation instructions are consistent with the Final Results . . . ." Id.

The same day that it issued this memorandum, Commerce attempted to transmit corrected liquidation instructions, which were rejected by Customs because they contained language errors. The next day, September 18, 2009, ASI filed suit in the Court of International Trade pursuant to 28 U.S.C. § 1581(i), alleging that Commerce had no authority to correct the error, and, inter alia, requesting the court to order Commerce to instruct Customs to resume liquidation in accordance with the original

liquidation instructions.

That same day, the Court of International Trade entered a temporary restraining order ("TRO") preventing Customs or Commerce from taking any action to liquidate or reliquidate ASI's entries of merchandise exported by the Dare Group. However, on October 13, 2009, the Court of International Trade denied ASI's motion for a preliminary injunction and dissolved the TRO. ASI I, slip op. at 11. The court found that ASI had established a likelihood of success on the merits of its claim that the liquidation instructions were unlawful, concluding that Commerce's purported correction of the liquidation instructions "made a substantive change to the Second Amended Final Results" and "arbitrarily avoids express statutory and regulatory provisions governing the correction of ministerial errors." Id. at 7, 8. The court noted that it "will be inclined to remand the matter to the agency to address the calculation error against 19 U.S.C. § 1675(h) and 19 C.F.R. § 351.224." Id. at 8. Nevertheless, the court found that ASI had not established that it would suffer irreparable harm from having its entries liquidated because it has an adequate remedy under our decision in Shinyei Corp. of America v. United States, 355 F.3d 1297, 1311-12 (Fed. Cir. 2004). Id. at 8-9. The court also held that the balance of hardships weighed in favor of the government because the government might be harmed by being statutorily foreclosed from reliquidation. Id. at 10.

On October 22, 2009, ASI learned that Customs was beginning the process of liquidating ASI's entries at the higher rate. The Court of International Trade denied ASI's motion for injunction pending appeal on October 26, 2009. See Am. Signature, Inc. v. United States, No. 09-00400 (Ct. Int'l Trade Oct. 26, 2009) ("ASI II"). On October

27, 2009, ASI filed an emergency motion for an injunction pending appeal with this court, which we granted on October 28, 2009, on the condition that ASI file a waiver of the time period requirement of 19 U.S.C. § 1501. The next day, ASI delivered the waiver.

We heard oral argument on November 19, 2009. We thereafter requested and received supplemental briefs as to the scope of Commerce's authority to correct ministerial errors. We have jurisdiction over the Court of International Trade's denial of ASI's motion for a preliminary injunction under 28 U.S.C. § 1292 (c)(1).

DISCUSSION

In determining whether a preliminary injunction should issue, we apply the four factor test set forth by the Supreme Court. In general, "[a] plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 129 S. Ct. 365, 374 (2008); see Titan Tire Corp. v. Case New Holland, Inc., 566 F.3d 1372, 1375-76 (Fed. Cir. 2009). The governing standard of review on appeal of a grant or denial of a preliminary injunction is abuse of discretion. Titan Tire, 566 F.3d at 1365. "An abuse of discretion may be established under Federal Circuit law by showing that the court made a clear error of judgment in weighing the relevant factors or exercised its discretion based on an error of law or clearly erroneous fact finding." Quingdao Taifa Group Co., Ltd. v. United States, 581 F.3d 1375, 1379 (Fed. Cir. 2009) (internal citation and quotation marks omitted).

We address these factors in turn.

I Likelihood of Success on the Merits

We first consider ASI's likelihood of success on the merits. The government and the domestic producers contend that the error in ASI's assessment rate is an error in the July 10, 2009, liquidation instructions, and that under our decision in Ugine II, the error could thereafter be corrected at any time before liquidation occurred. ASI on the other hand contends that the error was an error "in" the Second Amended Final Results and can only be corrected in accordance with the procedures set forth in 19 U.S.C. § 1675(h) and Commerce's implementing ministerial error regulation, 19 C.F.R. § 351.224. 19 U.S.C. § 1675(h) authorizes the correction of ministerial errors "in final determinations within a reasonable time," and authorizes Commerce to promulgate regulations providing for such corrections.[11] Commerce has promulgated such regulations. See 19 C.F.R. § 351.224.

The Court of International Trade agreed with ASI that the errors were "in" the final results, stating that "Commerce[] [is attempting] to correct a routine ministerial error contained in the Second Amended Final Results through a purported correction to liquidation instructions," ASI II, slip op. at 8, and that "ASI's calculated assessment rate

---

[11]    19 U.S.C. § 1675(h) provides:

The administering authority shall establish procedures for the correction of ministerial errors in final determinations within a reasonable time after the determinations are issued under this section. Such procedures shall ensure opportunity for interested parties to present their views regarding any such errors. As used in this subsection, the term "ministerial error" includes errors in addition, subtraction, or other arithmetic function, clerical errors resulting from inaccurate copying, duplication, or the like, and any other type of unintentional error which the administering authority considers ministerial.

[is] in the Second Amended Final Results" and "is an integral part of Commerce's administrative review determination." ASI I, slip op. at 7.

We agree with the Court of International Trade and ASI that the corrections to the assessment rates were corrections of errors "in" the Second Amended Final Results, i.e., that the calculations performed using Commerce's antidumping margin calculation program formed a part of Commerce's administrative review determination under 19 U.S.C. § 1675(a)(2)(A). See ASI I, slip op. at 7. This is so for several reasons.

First, Commerce's regulations implementing section 1675(h) (subsections (b) and (c) of section 351.224) treat errors in data prepared "in connection with" the final results as being subject to the section 1675(h) procedure, i.e., the regulations equate "in" with "in connection with." We give Chevron deference to this regulatory construction. See Chevron, U.S.A., Inc., v. Natural Res. Def. Council, 467 U.S. 837, 842-43 (1984).

Second, as Commerce conceded at oral argument, the calculations at issue here were prepared "at the same time as" and "in connection with" preparation of Commerce's final determination. See Oral Arg. at 22:53-55, 24:00-09; see also Def.-Appellee's Br. 5 ("In practice, the calculation of importer specific assessment rates under section 351.212(b)(1) occurs concurrently with the determination of exporter specific dumping margins within the same computer program."). This conclusion is supported by the record. On August 20, 2008, Commerce published the Final Results in the Federal Register. The Final Results themselves noted that "we [Commerce] have calculated customer/importer-specific antidumping duty assessment amounts." Final

Results, 73 Fed. Reg. at 49,167 (emphasis added). The record reflects that Commerce ran its margin calculation program on August 11, 2008 (before the publication of the Final Results) and at that time calculated an importer-specific percent ad valorem assessment rate for ASI. Though the margin calculation program was run again several days after the publication of the Second Amended Final Results to produce the assessment rate at issue here, it is clear that the preparation of such assessment rates using the margin calculation program is a part of Commerce's administrative review procedures.

Third, though the importer-specific assessment rates themselves were not disclosed in the Federal Register, Commerce agrees that this is not dispositive as to the question of whether they are a part of the final results of the administrative review. Indeed, Commerce conceded at oral argument that many calculations are not published in the Federal Register, but Commerce still regards them as being a part of their final results. See Oral Arg. at 24:44-25:09 ("[A] number of things also don't get published in the Federal Register or in the decision memo and . . . those things still would be subsumed within the final results.").

Fourth, we have recognized that challenges to dumping margins and other aspects of final results are properly brought in the Court of International Trade under 28 U.S.C. § 1581(c). See Consol. Bearings Co. v. United States, 348 F.3d 997, 1002 (Fed. Cir. 2003). The Court of International Trade has routinely exercised jurisdiction in those proceedings to consider challenges to assessment rate methodology and requests to correct ministerial errors in assessment rates. See, e.g., Fujian Lianfu Forestry Co., Ltd. v. United States, 638 F. Supp. 2d 1325, 1333 (Ct. Int'l Trade 2009) (exercising

jurisdiction under section 1581(c) in a challenge to Commerce's method of calculating assessment rates); <u>Hyundai Elec. Indus. Co. v. United States</u>, 395 F. Supp. 2d. 1231, 1234, 1242-43 (Ct. Int'l Trade 2005) (exercising jurisdiction under section 1581(c) and permitting Commerce to correct a ministerial error in the program that calculates assessment rates); <u>Koyo Seiko Co., Ltd. v. United States</u>, 110 F. Supp. 2d 934, 935 (Ct. Int'l Trade 2000) (exercising jurisdiction under section 1581(c) in a challenge to Commerce's method of calculating assessment rates), <u>aff'd</u>, 258 F.3d 1340 (Fed. Cir. 2001). Commerce has apparently never before challenged jurisdiction under section 1581(c) to consider such assessment rate issues. If we were to adopt the view that errors in the calculations of assessment rates do not form a part of final determinations, a party seeking to challenge the manner in which Commerce calculated assessment rates would need to wait until liquidation instructions were issued, and then bring a separate action under 28 U.S.C. § 1581(i). It is only logical for the Court of International Trade to consider any alleged errors in the assessment rates when challenges to the dumping margins are also being considered because assessment rates are affected by dumping margin calculations.

While the domestic producers argue that we owe <u>Chevron</u> deference to Commerce's determination in its September 18, 2009, memorandum to file that the error was not "in" the final results,[12] we think no such deference is owed because Commerce's construction is not a reasonable construction of the statute, for the reasons we have described immediately above. Even now, Commerce is unable to articulate a

---

[12]    <u>See</u> <u>ASI I</u>, slip op. at 5 ("[Commerce] does not consider that it is correcting an error in the <u>Final Results</u>. Instead, it is correcting the margin program to ensure that the liquidation instructions are consistent with the <u>Final Results</u>.").

coherent theory as to why we should adopt its approach.  For the same reason, we see no need to remand this proceeding for further consideration by Commerce as to the scope of Commerce's authority under 1675(h).

We conclude that the errors in question were "in" the Second Amended Final Results.

In light of our conclusion that the error here was an error in the final results of the administrative review, we consider whether Commerce had the authority to correct the error sua sponte. [13]  This turns on whether Commerce acted within a "reasonable time" under section 1675(h).  The statute does not define what constitutes a "reasonable time," but leaves it to Commerce to define what constitutes a "reasonable time."  Under Chevron, Commerce has considerable discretion in defining a "reasonable time."  See Chevron, 467 U.S. at 842-43; United States v. Eurodif S.A., 129 S. Ct. 878, 886-87 (2009).  The question is whether it has in fact defined a "reasonable time" in the regulations.

Commerce's implementing ministerial error regulation provides for ministerial error correction at the request of interested parties.  The regulations set forth various time limits for the correction of errors at the request of a party to the proceeding, but do not deal explicitly with sua sponte error correction by Commerce.  However, Commerce has long claimed the authority to correct ministerial errors during judicial review of final results even when no request to correct the error has been made by an interested party

---

[13]    The domestic producers do not argue that Commerce was compelled to correct the errors upon the domestic producers' request; no timely request was made for a correction by the domestic producers after the disclosures mandated by section 351.224(b) of the regulations.

pursuant to the regulations.  See, e.g., <u>Hyundai Elec. Indus. Co. v. United States</u>, 395 F. Supp. 2d 1231, 1243 (Ct. Int'l Trade 2005) (citing <u>Shandong Huarong Gen. Corp. v. United States</u>, 159 F. Supp. 2d 714, 727 (Ct. Int'l Trade 2001); <u>Aramide Maatschappij V.o.F. v. United States</u>, 901 F. Supp. 353, 361 (Ct. Int'l Trade 1995)), <u>aff'd sub nom.</u> <u>Shandong Huarong Gen. Group Corp. v. United States</u>, 60 F. App'x 797 (Fed. Cir. 2003).  The statute and the regulation clearly permit the sua sponte correction of a ministerial error by Commerce whether or not a party has requested correction within the period specified in the regulation.

The question is then whether the regulation establishes a time limit for such sua sponte corrections.  On its face the preamble to the regulation contemplates that corrections will be made before Commerce's final determination becomes final, i.e., before the time for judicial review has expired.  See Antidumping Duties; Countervailing Duties; Proposed Rules, 61 Fed. Reg. 7308, 7320 (Feb. 27, 1996).

> The principal goal of these changes is to <u>provide for the issuance of a correction notice normally within 30 days</u> after the date of public announcement of the preliminary or final determination or final results of review.  The date of public announcement is the date on which the signed determination or results of review is first made available to interested parties.  <u>This goal is consistent with the proposal from a number of commentators that the Department should respond to ministerial error allegations prior to the date when a summons must be filed with the Court of International Trade</u> or when a notice of intent to commence panel review must be filed with the NAFTA Secretariat.  This 30-day framework is intended to avert needless litigation by allowing parties sufficient time to review the correction notice before the litigation deadline arrives.

<u>Id.</u> (emphases added).  The regulation itself also provides that

> [w]here practicable, the Secretary will announce publicly the issuance of a correction notice, and <u>normally will do so within 30 days after the date of public announcement, or, if there is no public announcement, within 30 days after the date of publication, of the preliminary determination, final determination, or final results of review</u> (whichever is applicable). In

addition, the Secretary will publish notice of such corrections in the Federal Register.

19 C.F.R. § 351.224(e) (emphasis added).

While the regulation is perhaps not a model of clarity, Commerce in its supplemental brief has interpreted the regulation to impose such a time limit.[14] See Def.-Appellee's Supplemental Br. 2-3. Commerce's brief states that "Commerce may not correct ministerial errors in final results of administrative reviews . . . if those errors are discovered after the expiration of the 30-day deadline for seeking judicial review of those results. Id. Similarly, "Commerce promulgated its regulation and explained that it must normally correct ministerial errors within 30 days because 19 U.S.C. § 1516a requires that an interested party commence an action within 30 days of the publication in the Federal Register of final results." Id. at 4.

In general, "[t]he agency's construction of its own regulations is 'of controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" Reizenstein v. Shinseki, 583 F.3d 1331, 1335 (Fed. Cir. 2009) (citing Cathedral Candle Co. v. U.S. Int'l Trade Comm'n, 400 F.3d 1352, 1364 (Fed. Cir. 2005)) (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945)); Christensen v. Harris County, 529 U.S. 576, 588 (2000); Auer v. Robbins, 519 U.S. 452, 461 (1997); Gose v. U.S. Postal Serv., 451 F.3d 831, 836 (Fed. Cir. 2006) ("As a general rule, we must defer to an agency's interpretations of the regulations it promulgates, as long as the regulation is ambiguous and the agency's interpretation is neither plainly erroneous nor inconsistent with the

---

[14] Commerce indicated at oral argument that it does not have the authority to correct ministerial errors pursuant to its regulations after the time for judicial review of final results has expired. See Oral Arg. at 35:12-36:00. After oral argument, this court requested supplemental briefs on the issue in order to provide the opportunity for Commerce to more formally present its position.

regulation." (citing <u>Gonzalez v. Oregon</u>, 126 S. Ct. 904, 914; <u>Christensen</u>, 529 U.S. at 588; and <u>Seminole Rock</u>, 325 U.S. at 413-14)).

However, the question whether an agency's interpretation of its regulations announced for the first time in a brief is entitled to deference has generated considerable authority both in the Supreme Court and our own court. <u>See</u> <u>Auer</u>, 519 U.S. at 462-63; <u>Reizenstein</u>, 583 F.3d at 1335; <u>Abbott Labs. v. United States</u>, 573 F.3d 1327, 1332-33 (Fed. Cir. 2009); <u>Caribbean Ispat Ltd. v. United States</u>, 450 F.3d 1336, 1340 (Fed. Cir. 2006). Where the agency's interpretation seeks to advance its litigating position, deference is typically not afforded to the agency's position announced in a brief. <u>See</u> <u>Bowen v. Georgetown Univ. Hosp.</u>, 488 U.S. 204, 213 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate."). But where the agency is not advancing its litigating position, deference may be afforded an agency's position articulated in its brief. For example, in <u>Auer</u>, the Supreme Court deferred to an agency's position, advanced in an amicus brief. 519 U.S. at 461. Distinguishing that circumstance from the situation where the agency's position is a "post hoc rationalizatio[n] advanced by an agency seeking to defend past agency action from attack," the Supreme Court noted that "[t]here is simply no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." <u>Id.</u> at 462 (citation and internal quotation omitted). While here the agency's position is not contained in an amicus brief, it is also not a situation in which the agency interpretation advances the agency's litigating position. Quite the contrary. The agency's interpretation of the regulations is in fact contrary to the agency's litigating position—that it had the authority to correct the error. Under such

circumstances we conclude that deference under <u>Auer</u> is owed to Commerce's interpretation of its regulation, and that Commerce's sua sponte corrections must be made before the final determination is no longer subject to judicial review.

Here, as Commerce concedes, the error was not corrected within this timeframe; indeed it was not discovered until ninety-nine days after the dismissal by the domestic petitioners of their lawsuit before the Court of International Trade. Because Commerce did not correct the error before the time for judicial review had expired, we conclude that the error cannot now be corrected and that ASI has demonstrated a likelihood of success, indeed a certainty of success, on the merits.[15]

## II Irreparable Harm

We next consider the question of irreparable injury. The Court of International Trade concluded that ASI failed to demonstrate irreparable harm. <u>ASI II</u>, slip op. at 13; <u>ASI I</u>, slip op. at 9. Citing <u>Shinyei Corp. of America v. United States</u>, 355 F.3d 1297, 1311-12 (Fed. Cir. 2004)), the Court of International Trade concluded that ASI has an

---

[15] The government argues that ASI is judicially estopped from challenging Commerce's authority to make the correction at issue here. Def.-Appellee's Br. 14-17. This argument is premised on the government's assertion that ASI raised the opposite argument from the one they raise here, and prevailed, in a previous case concerning earlier furniture imports. <u>See</u> <u>Am. Signature, Inc., v. United States</u>, 477 F. Supp. 2d 1281 (Ct. Int'l Trade Feb. 14, 2007), <u>rev'd</u>, No. 2007-1216 (Fed. Cir. Nov. 30, 2007). We agree with ASI that ASI's legal position in the previous case and this case are entirely consistent. In the previous case, ASI challenged the lawfulness of liquidation instructions, which were issued pursuant to 19 C.F.R. § 351.212(c), because they did not reflect corrections Commerce had already made to cash deposit rates in the administrative review. Thus, in that case, unlike here, Commerce had made timely determinations to correct ministerial errors during the investigation. ASI argued that those corrections must be reflected in the liquidation instructions issued by Commerce. ASI did not argue that Commerce was authorized to correct an error in assessment rates by issuing liquidation instructions whose assessment rates differed from those calculated during the administrative review proceeding.

available and adequate remedy to correct the erroneous liquidation of entries caused by incorrect liquidation instructions, even if liquidation is permitted to go forward. ASI I, slip op. at 9.

In Zenith Radio Corp. v. United States, we held that absent a preliminary injunction, a challenge to an administrative review proceeding became moot when liquidation occurred. 710 F.2d 806, 810 (Fed. Cir. 1983). We explained that "[o]nce liquidation occurs, a subsequent decision by the trial court on the merits . . . can have no effect on the dumping duties assessed on entries." Id.; see ASI II, slip op. at 14. This court therefore concluded that Zenith would suffer irreparable harm if liquidation was not enjoined, and reversed the trial court's denial of a preliminary injunction on that basis. Zenith, 710 F.2d at 810.

In Shinyei, the plaintiff challenged Commerce's liquidation instructions as inconsistent with rates set forth in the amended review results that allegedly covered its entries. 355 F.3d at 1299, 1303. We held that in an action challenging liquidation instructions under 28 U.S.C. § 1581(i), the Court of International Trade may, under certain circumstances, use its equitable powers to compel reliquidation of entries if a preliminary injunction has been sought and denied. Id. at 1312.[16]

In Ugine & Alz Belgium v. United States, where the challenge was to liquidation instructions, we held that, despite potential for Shinyei relief, irreparable injury may exist from the denial of a preliminary injunction. 452 F.3d 1289, 1297 (Fed. Cir. 2006)

---

[16] However, in Mukand International, Ltd. v. United States, 502 F.3d 1366 (Fed. Cir. 2007), we upheld a decision of the Court of International Trade to deny Shinyei reliquidation because the plaintiff failed to seek an injunction against liquidation from the Court of International Trade before its entries had liquidated.

("Ugine I").  We noted that

> the question of the scope of Shinyei is a difficult one, for which the resolution is not obvious . . . .  Rather than deciding the scope of Shinyei in a preliminary injunction context . . . we conclude that the issue is sufficiently complex that we should resolve it only in a setting in which it has been litigated by the parties and decided by the trial court.

Id.  As in Ugine I, we conclude that the possibility of Shinyei relief does not defeat ASI's claim of irreparable harm.

The domestic producers also argue that ASI has made no showing that it is unable to protect its interests by protesting a reliquidation of entries under 19 U.S.C. § 1514.  The domestic petitioners appear to argue that a protest would automatically bar liquidation or reliquidation.  This statute authorizes importers to protest "decisions of the Customs Service, including the legality of all orders and findings entering into the same, as to . . . (5) the liquidation or reliquidation of an entry, or reconciliation as to the issues contained therein, or any modification thereof."  19 U.S.C. § 1514(a).  In Shinyei, we addressed the scope of this section, concluding that the protest provisions only apply to "decisions" of the "Customs Service."  Shinyei, 355 F.3d at 1311.  Here, as in Shinyei, the alleged agency error is on the part of Commerce, not Customs.  Therefore, section 1514(a) is inapplicable.

In conclusion, in view of our determination that the availability of Shinyei relief to ASI is uncertain and our determination that ASI may not have a remedy under section 1514(a), we conclude that ASI has made a sufficient showing of irreparable harm.

### III  Balance of Equities/Hardships

The Court of International Trade concluded that the balance of equities tips in Commerce's favor.  ASI II, slip op. at 15.  It based its conclusion on its perceived

inability to toll or permit waiver of the time limits of 19 U.S.C. § 1501 and remarked that "Commerce faces a significant hardship if it loses its ability to request Customs to reliquidate the entries pursuant to § 1501." Id. at 14-15. We agree that if Commerce were to be foreclosed from reliquidation by section 1501, this would indeed be a significant hardship. However, we disagree with the Court of International Trade that this outcome is likely.

Commerce argues that a preliminary injunction would foreclose Customs from reliquidating entries pursuant to 19 U.S.C. § 1501 due to the expiration of the ninety-day window in the statute. We cannot agree that Commerce is without a remedy if the ninety-day period elapses without reliquidation, for two reasons. First, under Shinyei, the deadline is inapplicable if reliquidation is ordered by a court.[17] As we noted in that case,

> the Court of International Trade's relief statute provides for entry of a money judgment "for or against the United States in any civil action commenced under section 1581 or 1582 of this title," [19 U.S.C.] § 2643(a)(1), and allows the court to "order any other form of relief that is appropriate in a civil action . . . . " Id. § 2643(c)(1) (emphasis added). The absence of an express reliquidation provision should not be read as a prohibition of such relief when the statute provides the Court of International Trade with such broad remedial powers. Here, the requested relief [reliquidation] is easily construed as "any other form of relief that is appropriate in a civil action."

Shinyei, 355 F.3d at 1312.

Second, and more importantly, waiver by ASI obviates any problem with the ninety-day deadline. In view of the potential hardship, this court required in its October

---

[17] Commerce agrees that this concern is inapplicable to entries that have yet to be liquidated. As to such entries, the grant of a preliminary injunction suspends the liquidation deadline.

28, 2009, order, and ASI submitted, a waiver of "any defense it might otherwise have against reliquidation of [the applicable] entries pursuant to 19 U.S.C. § 1501 based on the expiration of the 90-day period for reliquidation set forth therein, during the period in which the injunction entered by this Court is in effect." Waiver of Statute of Limitations Defense at 1, Am. Signature v. United States, No. 2010-1023 (Fed. Cir. Oct. 29, 2009). The Supreme Court has remarked that it has "'in the context of a broad array of constitutional and statutory provisions,' articulated a general rule that presumes the availability of waiver, United States v. Mezzanatto, 513 U.S. 196, 200-01 (1995)." New York v. Hill, 528 U.S. 110, 114 (2000). Further, the Supreme Court has announced that "absent some affirmative indication of Congress' intent to preclude waiver, we have presumed that statutory provisions are subject to waiver by voluntary agreement of the parties." Mezzanatto, 513 U.S. at 201. Therefore, we conclude this voluntary waiver adequately protects Commerce's interests in being able to reliquidate ASI's entries and prevents it from sustaining irreparable injury.

Thus, we conclude that the Court of International Trade erred in its analysis of the potential harm to Commerce. In view of our assessment that Commerce will not be foreclosed from reliquidation, if appropriate, and the uncertainty concerning the remedies available to ASI, we find that the balance of equities favors ASI.

IV  Public Interest

The public interest is served by ensuring that governmental bodies comply with the law, and interpret and apply trade statutes uniformly and fairly. Both sides in this dispute contend that they are seeking to effectuate these important goals. Therefore we find that the public interest does not clearly favor either party in this dispute.

CONCLUSION

We conclude that ASI has satisfied the requirements for a preliminary injunction. We reverse the Court of International Trade and require that the court grant the preliminary injunction prohibiting Customs or Commerce from taking any action to liquidate or reliquidate ASI's import entries that are the subject of this action, and for further proceedings consistent with this opinion.

<u>REVERSED</u>

COSTS

No costs.